Phillip WALKER, et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

No. CIV.A. 96–1267(PLF).

United States District Court, District of Columbia.

June 29, 2001.

Paul S. Dalton, William Houston, Dalton & Dalton, Alexandria, VA, for Plaintiffs.

Melvin W. Bolden, Jr., Assist. Corp. Counsel, Washington, DC, for Defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL L. FRIEDMAN, District Judge.

Plaintiffs Phillip Walker and Norma Jackson brought this action for compensatory damages against the District of Columbia, claiming that the District of Columbia Public Schools ("DCPS") failed to provide Phillip with the special education to which he was entitled under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[1] Plaintiffs argue that DCPS denied Phillip a free appropriate public education by failing to discover Phillip's disability in a timely manner upon his entry into the school system in 1986, misdiagnosing Phillip in 1991 as mildly mentally retarded (instead of learning disabled), failing to conduct a timely tri-annual evaluation, failing to provide Phillip with an appropriate individual education plan ("IEP") for the 1994–95 and

---

[1] Norma Jackson, Phillip's paternal aunt and legal guardian at the time the complaint was filed, brought this action on behalf of Phillip and in her own right. Rosella Walker, Phillip's mother, initially was a party to this action but withdrew as a plaintiff at the outset of trial. In addition to the District of Columbia, plaintiffs named as a defendant Franklin L. Smith, the Superintendent of the District of Columbia Public Schools at the time the suit was filed, in his official capacity. The current Superintendent is Dr. Paul L. Vance.

1995–96 school years, failing to provide Phillip with a proper placement from 1991 to 1996, failing to hold a due process hearing in a timely manner, and failing to provide the transportation services required by the IDEA. Defendants contend that Phillip was not misdiagnosed, that his IEPs and placements were appropriate, and that if anything adversely affected Phillip's educational opportunities it was a dysfunctional home life and extensive absenteeism.

Plaintiffs initially sought compensatory and punitive damages for the District's alleged transgressions under the IDEA; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Civil Rights Act, 42 U.S.C. § 1983; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131. Prior to trial, the Court concluded that although damages were not available to plaintiffs under the IDEA itself, compensatory damages could still be pursued by maintaining a Section 1983 claim to vindicate rights under the IDEA. *See Walker v. District of Columbia,* 969 F.Supp. 794, 795 (D.D.C.1997). The Court also found that compensatory damages could be sought under the Rehabilitation Act. *Id.* at 797–98. The Court determined, however, that under no set of facts could plaintiffs obtain punitive damages, since such damages are not available against the District of Columbia as a matter of law. *Id.* at 798.[2]

The case was tried before the Court without a jury over a period of seven days in May and September 2000. At trial, plaintiffs Phillip Walker and Norma Jackson testified on their own behalf. Plaintiffs also called as witnesses Phillip's mother, Rosella Walker; five individuals employed by DCPS who testified about

the customs, policies and practices of DCPS, Michael Snipes, Jeff Myers, Dr. Robert Burch, Elizabeth White, and Arlene King–Berry; two administrators at private schools who testified about the customs, policies and practices of DCPS, Sharon Raimo and Gail Hilliard–Nelson (who also was Phillip's principal for a year); an expert in psychology, Dr. Raphael Minsky; an expert in economics, Dr. Richard Lurito; an expert in special education, Dr. Raymond Holmes; and an expert in clinical psychology, Dr. Macletus Dejoie–Smith.

Defendants called as witnesses four of Phillip's former teachers, Carol Bennett, Theresa Gasaway, Lucy Herndon and Melvin Thomas; two school psychologists who had evaluated Phillip, Dr. Frank Grant and Dr. Carole Barksdale; Phillip's child advocate and the advocate's supervisor, Blondell Washington and Mary Lou Tietz; an expert in clinical psychology, Dr. Richard Ruth; an expert in child neurology, Dr. Miryam Davis; an expert in clinical social work, Janet Burton; an expert in economics, Dr. Charles Betsey; and an individual who served as DCPS's custodian of records, Michael Snipes. After carefully considering the testimony of the witnesses, the evidence introduced at trial, and the post-trial written arguments of counsel, the Court concludes that plaintiffs have proven none of their claims by a preponderance of the evidence and it therefore will enter judgment for the defendants.

## I. FINDINGS OF FACT REGARDING PHILLIP WALKER'S EDUCATION

Upon a careful consideration and evaluation of the testimony of all the witnesses

---

**2.** Throughout the course of this litigation, including trial, plaintiffs failed to present any testimony, evidence or argument in support of their claim under the ADA. *See Walker v.*

*District of Columbia,* 969 F.Supp. at 795 n. 2. The Court therefore will grant judgment for defendants on plaintiffs' ADA claim without further discussion.

and the documentary evidence admitted at trial, and making credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact:

### A. John Tyler School (Dec.1986–1988)
#### 1986–87 School Year

1. Phillip Walker enrolled at the John Tyler School in the District of Columbia Public School System in the Fall of 1986, at age 6. DEX 3A; DEX 3C.[3] Phillip's mother testified that she attempted to enroll Phillip at John Tyler in the Fall of 1985, but there is no corroborative testimony or evidence of such an attempt. R. Walker Tr. 326–28. Ms. Walker testified that she decided to wait until 1986 to enroll Phillip because an individual at John Tyler told her in 1985 that the classes were overcrowded, that Phillip would be learning nothing more than what Ms. Walker was already teaching Phillip at home, and that Phillip would not be harmed educationally if she chose to wait a year to enroll him. R. Walker Tr. 327–28. Plaintiffs offered no testimony or evidence to support Ms. Walker's assertion that she attempted to enroll Phillip in 1985 or that this conversation ever took place.

2. For the 1986–87 school year, Phillip was assigned to Ms. C. Sloane's pre-kindergarten class. Bennett Tr. 57–58; DEX 3A; DEX 3C. Ms. Walker, however, insisted that Phillip started the 1986–87 school year not in pre-kindergarten but in the first grade. R. Walker Tr. 328–29. She testified that Phillip had trouble keeping up in the first grade class and that his teacher demoted him to the pre-kindergarten class in the middle of the year. R. Walker Tr. 329–30, 332–33. At another point, Ms. Walker testified that Phillip was in the second grade during the 1986–87 school year. R. Walker Tr. 340–41. Ms. Walker said that she could not remember any of the teachers' names during this period or exactly when the demotion took place. R. Walker Tr. 337–39, 341. Plaintiffs offered no corroborative evidence or testimony to support Ms. Walker's uncertain and contradictory assertions. By all accounts other than Ms. Walker's, Phillip spent the full 1986–87 school year enrolled in Ms. C. Sloan's pre-kindergarten class, and the Court finds this as a fact.

3. Ms. Walker also testified that she spoke with one of Phillip's teachers, and perhaps his principal, during the 1986–87 school year about Phillip's difficulty in reading and his need for special education. R. Walker Tr. 330–34. Ms. Walker testified that the teacher told her that Phillip might need special education. R. Walker Tr. 331. Again, other than Ms. Walker's testimony, nothing was offered by the plaintiffs in support of this assertion. Based on the untrustworthiness and lack of clarity of Ms. Walker's testimony on this point, the Court cannot find that such a conversation ever occurred.

4. According to Phillip's 1986–87 Early Childhood Progress Report, Phillip was absent 65 days and tardy 10 days over the course of the 1986–87 school year. DEX 3A. The Progress Report also contains the comment, "Please make an appointment for a conference," and indicates that Phillip should be promoted to kindergarten for the 1987–88 school year. DEX 3A.

5. Ms. Walker and Phillip both testified that Phillip really wasn't absent that often, and that when he was it was almost always

---

**3.** Plaintiffs' trial exhibits are cited throughout this Opinion as "PEX," while defendants' trial exhibits are cited as "DEX." All references to witness testimony are cited by the witness's name and the page(s) of the transcript on which the testimony is located (*e.g.*, "Bennett Tr. 60").

related to Phillip's asthma. R. Walker Tr. 338–40, 342; P. Walker Tr. 21–22. Defendants elicited testimony, however, that suggests several other reasons for Phillip's excessive absenteeism during this time period and in subsequent years, including the death of Phillip's grandparents, with whom he and his mother resided and who played major supporting roles in Phillip's early upbringing; Ms. Walker's depression and drug addiction; frequent moves, residing at up to seven different locations between 1986 and 1994, including homeless shelters and transitional housing; and the time Ms. Walker spent in drug rehabilitation programs which forced Phillip to live with out-of-state relatives who could not transport Phillip to school. Burton Tr. 79–91.

### 1987–88 School Year

6. Carol Bennett testified that for the 1987–88 school year, Phillip was assigned to her kindergarten class at John Tyler School. Bennett Tr. 59; DEX 3B; DEX 3C. Ms. Walker, however, gave testimony that conflicted with Ms. Bennett's testimony and Phillip's records from John Tyler, asserting that Phillip went directly from pre-kindergarten in 1986–87 to the second grade in 1987–88. R. Walker Tr. 333. At another point, Ms. Walker insisted that Phillip attended Garrison Elementary, not John Tyler, during the 1987–88 school year. R. Walker Tr. 341. Phillip's testimony conflicted with his mother's; he testified that he attended John Tyler and had Ms. Bennett as a teacher, although he couldn't remember exactly when he attended or for how long. P. Walker Tr. 8–9. The testimony of Phillip and the testimony and exhibits offered by the defendants weigh heavily against Ms. Walker's uncertain and unreliable recollection of the events of the 1987–88 school year. The Court credits Ms. Bennett's testimony and finds that Phillip was in her kindergarten class at John Tyler during the 1987–88 school year.

7. According to his 1987–88 Early Childhood Progress Report, Phillip was absent 95½ days and tardy seven days over the course of the 1987–88 school year. Bennett Tr. 59; DEX 3B. In a comment to the Progress Report, Ms. Bennett encouraged Ms. Walker to participate in Phillip's education and requested that she meet with the school principal: "Ms. Walker: *You* must encourage Phillip and help him learn, grow in confidence and receive help at school. I have tried all year. Please see Mrs. Kelly the principal. Mrs. Bennett." DEX 3B; Bennett Tr. 60–61. The Report contains a separate comment written by Ms. Bennett that "Phillip *must* come to school *every day*. He should be in bed by 8:30—9:00 each school night. He has not learned good school habits. He wants to play too much." DEX 3B; Bennett Tr. 60. There was no testimony or other evidence presented at trial indicating whether Ms. Walker ever responded to Ms. Bennett's entreaties.

8. According to his permanent record, Phillip completed Ms. Bennett's kindergarten class in June 1988. Bennett Tr. 58; DEX 3C. A second page of Phillip's permanent record contains the partial notation: "tried all year to get him tested-suspected severe learning disability." Bennett Tr. 65–66; DEX 3E. It is not clear from the permanent record or from any of the testimony at trial who wrote the comment, when the comment was written, or in what context the comment was made.

### B. Garrison Elementary (1988–1993)
### 1988–89, 1989–90, and 1990–91 School Years

9. According to Ms. Walker, Phillip next attended Garrison Elementary School, although she could not say during what school year. R. Walker Tr. 334. Ms. Walker testified that when she enrolled

Phillip at Garrison she spoke to a teacher and the principal about Phillip's need for special education services, although she could not recall either of their names or when she spoke with them. R. Walker Tr. 334–35. Phillip also recalled attending Garrison Elementary after John Tyler and remembers being in a special education class of eight or nine students, but he couldn't recall when he attended Garrison or who his teachers were. P. Walker Tr. 9, 22–25. While it seems clear from this testimony that Garrison was the first school Phillip attended after John Tyler, there is simply no evidence that he attended Garrison or any other school during the 1988–89, 1989–90 or 1990–91 school years. There similarly was no testimony that the Walkers even resided in the District of Columbia from 1988 to 1990. The Court cannot find by a preponderance of the evidence that Phillip attended Garrison during the 1988–89, 1989–90 or 1990–91 school years or that Ms. Walker requested testing or special education for Phillip during any of these years. The record is simply barren with respect to Phillip's education during these three years.

### 1991 Testing

10. On May 21, 1991, Ms. Walker executed a Comprehensive Student Services Form requesting that Phillip be evaluated by DCPS and granting DCPS permission to conduct such an evaluation. DEX 21. Ms. Walker gave conflicting testimony regarding this request and about Phillip's time at Garrison generally. Ms. Walker testified that she couldn't remember Phillip's teachers' names or ever speaking with them about Phillip's need to be tested; yet she also testified that she spoke with Theresa Gasaway, one of Phillip's teachers, about just that. Ms. Walker then testified that Phillip was never tested while at Garrison, yet later acknowledged that he might have been tested. She testified at

one point that Phillip was enrolled in special education classes while at Garrison; yet she testified at another point that he was not enrolled in special education classes because, according to what Phillip's teachers told Ms. Walker, there were too many children who needed special education services who took priority over Phillip. Finally, Ms. Walker testified that Phillip never received an IEP while at Garrison and that she never attended an IEP meeting at Garrison, but it seems clear from the IEPs submitted by the defendants as exhibits and from the testimony of other witnesses that several IEPs were created for Phillip while he attended Garrison and that Ms. Walker even attended one of the IEP meetings. *See infra* at 10–14. Ms. Walker's testimony with respect to Phillip's time attending Garrison Elementary was unclear, uncertain, often conflicting, and ultimately unreliable. It is very likely, however, that Phillip did not attend Garrison before the spring or possibly even the fall of 1991.

11. On June 18, 1991, Dr. Frank E. Grant, a DCPS psychologist, interviewed, tested and evaluated Phillip and subsequently produced a Psychoeducational Evaluation report of his findings. DEX 4. The tests Dr. Grant performed on Phillip included the Wechsler Intelligence Scale for Children–Revised (a cognitive or intelligence test); a Woodcock–Johnson Psychoeducational Battery–Revised (an academic achievement test); a Beery Visual Motor Integration Test (a visual motor coordination test); a Vineland Adaptive Behavior Scale (an adaptive behavior test); a Visual Aural Digit Span test (an intersensory integration and memory test); and a House–Tree–Person test (a behavior and emotionality test). Grant Tr. 109–110. After reviewing Phillip's performance on these tests, Dr. Grant concluded "unquestionably" that Phillip was "mentally defi-

cient or mentally retarded" (the two terms being used interchangeably). Grant Tr. 110–12. Dr. Grant found that Phillip's scores were "uniformly low" and that his cognitive functioning "measured well within the mentally retarded range." DEX 4.

12. On July 12, 1991, an IEP meeting was held to develop Phillip's IEP for the 1991–92 school year. DEX 22. Among those present at the meeting were Rosella Walker and Dr. Grant. DEX 22; R. Walker Tr. 376. Based on a disability classification of mental retardation, the team recommended that Phillip receive a Level III placement that would include 20 hours per week of special education and related services and 10 hours per week of mainstreamed education (classes with non-disabled peers). DEX 22. Ms. Walker signed the IEP approving this placement. DEX 22; R. Walker Tr. 376.

*1991–92 School Year*

13. For the 1991–92 school year, Phillip was assigned to Theresa Gasaway's special education class at Garrison Elementary. Gasaway 9/25/00 Tr. 138. For that school year, Ms. Gasaway used the July 12, 1991, IEP as a guide to determine what special education instruction and services Phillip should receive. Gasaway 9/25/00 Tr. 138–39. Traditionally there is a 30–day time period at the beginning of the school year during which the existing IEP, the student and the related services providers are reviewed. Gasaway 9/25/00 Tr. 164. After the 30–day period was up for Phillip, a group that did not include Ms. Walker met informally to discuss the IEP and found that it was appropriate for the 1991–92 school year. Gasaway 9/25/00 Tr. 164–65. The IEP lists general goals for Phillip but does not indicate on what dates those goals were mastered because Ms. Gasaway kept track of her students' progress on separate documents called "quick checks." Gasa-

way 9/25/00 Tr. 166–69. Ms. Gasaway believed that the July 12, 1991, IEP was an appropriate one for Phillip. Gasaway 9/25/00 Tr. 139–40.

14. During the 1991–92 school year, Ms. Gasaway taught Phillip with the help of a full time special education assistant. Gasaway 9/25 Tr. 141. Having a teacher and an assistant in the classroom ensured that students such as Phillip could get individual attention and would have the opportunity to ask questions. Gasaway 9/25 Tr. 141–42. According to Ms. Gasaway, during the 1991–92 school year Phillip was a receptive student in terms of completing activities and did the best he could under the circumstances, but he required a lot of individual attention. Gasaway 9/25 Tr. 142–43. Eventually, Ms. Gasaway became very concerned about Phillip's tendency to arrive at school sleepy and "somewhat disheveled" and about his sporadic attendance. Gasaway 9/25/00 Tr. 143–44. According to what Phillip told Ms. Gasaway, Phillip would come to school sleepy because his mother had a baby that he had to care for. Gasaway 9/25/00 Tr. 143. Ms. Gasaway was concerned about Phillip's hygiene (failure to use deodorant, brush his teeth, etc.). Gasaway 9/25/00 Tr. 144. She felt that his mother should have been monitoring such things. Gasaway 9/25/00 Tr. 144. With respect to Phillip's attendance, there were periods of time when he would be out for a week at a time, in whole or in part because of his asthma problems. Gasaway 9/25/00 Tr. 143–44.

15. During the 1991–92 school year, Ms. Gasaway also became very concerned about Phillip's increasingly aggressive and abusive conduct in the classroom. Gasaway 9/25/00 Tr. 146. Students teased Phillip about his mother being a "crackhead," something about which he was very sensitive and would not discuss with Ms. Gasaway. Gasaway 9/25/00 Tr. 146. Ms. Gasa-

way requested several meetings with Ms. Walker to address some of these problems, but Ms. Walker never responded to the requests. Gasaway 9/25/00 Tr. 145. The only time Ms. Gasaway was able to talk to Ms. Walker face to face was when Ms. Walker brought Phillip to school personally and Ms. Gasaway caught her before she left. Gasaway 9/25/00 Tr. 145. Unable to communicate with Ms. Walker, Ms. Gasaway discussed Phillip's absenteeism with Blondell Washington, Phillip's child advocate, and the Garrison School administrators and counselors. At one point Phillip's absenteeism was so severe that he was reported for truancy. Gasaway 9/26/00 Tr. 59.

16. Against this background, an annual IEP meeting was held on May 22, 1992 to develop Phillip's IEP for the 1992–93 school year. DEX 23. Prior to the meeting, Ms. Gasaway tried on several occasions to get Ms. Walker to participate in the IEP meeting. She sent a letter to Ms. Walker on May 1, 1992, which set a date and time for an IEP meeting. When Phillip's mother did not show up, Ms. Gasaway called and left a message for her on May 15. When she did not show up for the rescheduled meeting, Ms. Gasaway called again on May 22. When she did not show up for the third scheduled meeting, the IEP team went ahead with the meeting without Phillip's mother. Gasaway 9/25/00 Tr. 147–49; R. Walker Tr. 335. Based on a disability classification of educable mental retardation, the IEP team recommended that Phillip remain in a Level III placement that would include 21 hours per week of special education and related services and four hours per week of mainstreamed education. DEX 23.

*1992–93 School Year*

17. For the 1992–93 school year, Phillip continued in Theresa Gasaway's special education class. Gasaway 9/25/00 Tr. 138. Ms. Gasaway used the May 22, 1992, IEP as her guide because she helped create it and because she considered it an appropriate one for Phillip at the time. Gasaway 9/25/00 Tr. 147. Based on her educational background and on her own experience as Phillip's teacher, Ms. Gasaway had no reason to question the school psychologist's evaluation of Phillip as mentally retarded; she agreed with the diagnosis. Gasaway 9/25/00 Tr. 161. Ms. Gasaway testified that during the school year Phillip was in a lot of fights, which became an increasing problem because Phillip could not be physically restrained by Ms. Gasaway. Gasaway 9/25/00 Tr. 159–60. She again tried to meet with Ms. Walker, but Ms. Walker never responded. Gasaway 9/25/00 Tr. 160–61. Ms. Gasaway believes that Phillip's home life had a "severe impact" on Phillip's ability to learn. Gasaway 9/25/00 Tr. 161–62.

18. On May 18, 1993, an annual IEP meeting was held to develop Phillip's IEP for the 1993–94 school year. DEX 24. Among those present at the meeting were Ms. Gasaway and Blondell Washington, Phillip's child advocate. DEX 24. Based on a disability classification of educable mental retardation, the team recommended that Phillip remain in a Level III placement that would include 24 hours per week of special education and related services and five hours per week of mainstreamed education. Ms. Gasaway again requested Ms. Walker's presence at the IEP meeting, but she never came. Gasaway 9/25/00 Tr. 158; Washington Tr. 55. In her place was Ms. Washington, who was present primarily to discuss Phillip's attendance and behavioral problems. Gasaway 9/25/00 Tr. 158; Washington Tr. 53, 65–66. Ms. Washington concurred in the education plan developed at the IEP meeting and signed the IEP in her role as

Phillip's child advocate. DEX 24; Washington Tr. 55–56, 63.

19. Ms. Washington, a case manager with Community Family Life Services and Phillip's child advocate, testified that she first became involved with Phillip because at the time the Walkers resided in transitional housing sponsored by an affiliate of Community Family Life Services, Trinity Lutheran Churches. Washington Tr. 49–52. When the Walkers entered the transitional housing, Ms. Walker signed consent forms permitting Ms. Washington to act as Phillip's child advocate. Tietz Tr. 131. Ms. Washington was assigned to monitor Phillip's progress because Phillip "very rarely" attended school and because of his behavior problems when he did attend. Washington Tr. 50–52, 56. Ms. Washington met with school officials and Ms. Walker concerning Phillip's poor attendance and behavior and filed reports with her agency. Washington Tr. 52, 56–59, 61–62, 66–70.

20. The Court finds that Phillip was tested and evaluated during his years at Garrison, that IEP meetings were held for each of the school years he was at Garrison, that his mother was invited to the IEP meetings but failed to attend, and that IEPs were developed for Phillip that resulted in a Level III placement and the provision of special education and related services for each of his years at Garrison.

*C. Backus Middle School (1993–1994)*

*1993–94 School Year*

21. For the 1993–94 school year, Phillip was enrolled in a special education class of 15 students taught by Lucy Herndon at Backus Middle School. Herndon Tr. 21–22. Ms. Herndon occasionally worked with Phillip one-on-one, but most of the individual work with Phillip was done by Ms. Herndon's classroom aide. Herndon Tr. 22. Ms. Herndon used as her guide

the May 18, 1993 IEP created while Phillip was still at Garrison. Herndon Tr. 24.

22. Phillip did not start at Backus at the beginning of the scheduled school year. For unexplained reasons, he did not arriving until October or early November. Herndon Tr. 22–23, 29. Phillip's attendance during the 1993–94 school year was "very poor." Herndon Tr. 22. After the Thanksgiving break, Phillip did not return to school for two weeks. Herndon Tr. 23, 29. He came back for a time, but then disappeared again after the Christmas break. Herndon Tr. 23. When he eventually returned, he stayed through spring break in March but then did not show up for the remainder of the school year. Herndon Tr. 23, 28–31. Ms. Herndon attempted to contact Phillip's mother by mail, by telephone and by physically going to her home, all to no avail. Herndon Tr. 22–23. Ms. Herndon notified DCPS's Special Education Division of Phillip's truancy, as all teachers were instructed to do in such situations. Herndon Tr. 39–40.

23. Ms. Washington, Phillip's child advocate, visited Phillip at Backus once or twice a month. Washington Tr. 59. She spoke with Ms. Herndon about Phillip's problems "acting out" in class and about his poor attendance. Washington Tr. 58. Ms. Washington again talked with Ms. Walker about Phillip's attendance and behavior problems. Washington Tr. 58–59. When Ms. Washington attempted to visit Ms. Walker at her home to discuss the problems, she witnessed a physical altercation between Ms. Walker and her boyfriend that occurred in front of Phillip. Washington Tr. 59–60. Ms. Washington ceased being Phillip's child advocate after Trinity Church terminated its relationship with Rosella Walker because Ms. Walker had tested positive for drug use and because of an arrearage in rent payments. Tietz Tr. 121–23. Tenants residing in the

transitional housing sponsored by the church agree to remain drug free. Tietz Tr. 122–23.

24. Phillip Walker testified that he attended Backus, but he couldn't remember when or for how long. P. Walker Tr. 10. He testified that the classrooms were hectic and disorganized and that he could not get enough help from the teachers. P. Walker Tr. 10. He said that he had trouble reading and that he asked other students for help, but that they wouldn't help him and made him feel bad about his learning difficulties. P. Walker Tr. 10–11.

### 1994–95 School Year

25. It is not entirely clear from the exhibits or the testimony at trial where Phillip attended school during the 1994–95 school year or whether an IEP was developed for him for that year. It is likely that he spent at least part of the 1994–95 school year at Backus, since that is where he attended classes during the 1993–94 school year and since his 1995–96 IEP, completed on October 24, 1995, lists but then crosses out "Backus" as Phillip's current school. DEX 26B; *see also* Jackson Tr. 311 (indicating that sometime in 1995 Ms. Jackson and Ms. Walker attempted to transfer Phillip from Backus to John Phillip Sousa Middle School). The state of the evidence does not permit the Court to make a definitive finding with respect to the 1994–95 school year, but it does seem likely that Phillip attended Backus during that time.

### 1995 Testing

26. Phillip was scheduled to receive a tri-annual psychological re-evaluation at the end of the 1993–94 school year. Backus notified Phillip's mother "several times" during the school year of the need to schedule Phillip's tri-annual evaluation, including through visits made by Ms. Herndon to the Walker home, but Phillip failed to appear for his re-evaluation. Herndon Tr. 22–28. On June 24, 1994, after the end of 1993–94 school year, Ms. Walker appeared at Backus and met with Ms. Herndon about Phillip's missed evaluations. Herndon Tr. 25, 35. At that time Ms. Herndon gave Phillip's mother a copy of Phillip's IEP for the 1993–94 school year, revised to reflect Phillip's progress over the school year, so that Ms. Walker could bring it to Phillip's tri-annual evaluation. Herndon Tr. 25–29; DEX 25. Ms. Herndon added a cover sheet to the IEP and modified it in certain ways to make clear that the document was not a new IEP, but instead was a special document created to reflect Phillip's progress over the 1993–94 school year for the benefit of the school psychologist who would be evaluating Phillip. Herndon Tr. 25–29.

27. On May 8, 1995, Dr. Carole Barksdale, a DCPS school psychologist, performed a tri-annual psychological re-evaluation of Phillip. DEX 5; Barksdale Tr. 2–3. She produced a Psychological Evaluation report of her findings on May 28, 1995. DEX 5; Barksdale Tr. 3. After reviewing Phillip's records (including Dr. Grant's initial evaluation of Phillip in 1991), observing him in class and testing him (including administering the Wechsler Intelligence Scale for Children–Third Edition, the Vineland Adaptive Behavior Scales, the Bender Gestalt, the Woodcock Johnson Psychoeducational Battery–Revised, the Incomplete Sentences test, the Draw a Person test and the Three Wishes test), Dr. Barksdale concluded that Phillip continued to function as a student with mental retardation. Barksdale Tr. 4–9; DEX 5. Dr. Barksdale acknowledged Phillip's anomalous score on the Vineland test, which she termed "adequate," but noted that she doubted the veracity of many of

Ms. Walker's responses on the test. Barksdale Tr. 6, 10.

### D. *John Phillip Sousa Middle School (October 1995—February 1996)*
#### *1995–96 School Year*

28. In September or October 1995, Phillip began living with his paternal aunt, Norma Jackson. Jackson Tr. 308; R. Walker Tr. 358–59. Because Ms. Jackson and Ms. Walker did not believe that Phillip was receiving adequate special education services at Backus, Ms. Jackson helped Ms. Walker get Phillip transferred to John Phillip Sousa Middle School. Jackson Tr. 310–11; R. Walker Tr. 359–60. According to Ms. Jackson, Phillip did not go to any school during the first couple months of the 1995–96 school year because he did not want other students to make fun of his learning disability. Jackson Tr. 312–13; R. Walker Tr. 361.

29. On October 24, 1995, an annual IEP meeting was held to develop Phillip's IEP for the 1995–96 school year. DEX 26B. Among those present at the meeting were Ms. Walker and Carolyn Chatmon, who is listed as Phillip's teacher. DEX 26B. It is unclear whether Ms. Chatmon was Phillip's teacher during the 1994–95 school year—possibly at Backus—or whether she preceded Melvin Thomas as his teacher at Sousa. DEX 26B. Based on a disability classification of educable mental retardation, the team recommended that Phillip continue in a Level III placement that would include 23 hours per week of special education and related services and seven hours per week of mainstreamed education. DEX 26B.

30. From October 1995 through February 1996, Phillip was enrolled in a special education class taught by Melvin Thomas at John Phillip Sousa Middle School. Thomas Tr. 42, 48. Phillip testified that the teachers at Sousa were too busy to help him and that he often got upset. P.

Walker Tr. 12–13. He testified that he would get so upset and embarrassed that he would just walk out of class or behave poorly and have to be removed from class. P. Walker Tr. 13.

31. On December 8, 1995, a second IEP meeting was held to revise Phillip's IEP for the 1995–96 school year. DEX 27. Among those present at the meeting were Melvin Thomas, Phillip's new special education teacher at Sousa, Dr. Barksdale, and Ms. Jackson. DEX 27; Jackson Tr. 309–10. Based on a disability classification of educable mental retardation, the team changed Phillip's recommended placement from a Level III to a Level IV setting that would include 30 hours per week of special education and related services and no hours of mainstreamed education. DEX 27. Dr. Barksdale, the DCPS psychologist who had tested and evaluated Phillip in May 1995, actively participated in the IEP meeting and agreed with the disability classification of educable mental retardation. Barksdale Tr. 18.

32. On December 12, 1995, Phillip requested a due process hearing, alleging that DCPS had failed to conduct an appropriate annual review of his IEP for the 1994–95 school year and that it failed to timely complete an IEP for the 1995–96 school year. PEX 70. Phillip contended in the request that these failures led to an inappropriate placement for all of the 1994–95 school year and at least the first half of the 1995–96 school year. PEX 70; Burch Tr. 215–216. A hearing was not scheduled at this time.

33. On January 29, 1996, Phillip made a second request for a due process hearing. PEX 71. Phillip complained in the request that in addition to the violations of the IDEA listed in his initial request, DCPS had further violated the IDEA by failing to respond to the December 12,

1995, request for a hearing and by failing to find a Level IV placement for Phillip as recommended in his December 8, 1995, IEP. PEX 71; Burch Tr. 216–17. Again, DCPS did not schedule a hearing at this time.

34. Phillip testified that it was around this time, when he was 14 or 15 years old, that he simply gave up on the District of Columbia public schools because he was frustrated that he could not learn as fast as other people his age. P. Walker Tr. 14–16.

### E. Kennedy Institute (March 1996—September 1999)

35. In February 1996 the Kennedy Institute accepted Phillip as a student. PEX 53. While it is not entirely clear from the testimony or exhibits admitted at trial, it appears that Phillip began attending the Kennedy Institute in March 1996. PEX 53; PEX 72. What is clear is that the placement initially was not the result of an IEP recommendation or a hearing officer determination.

36. On March 26, 1996, a due process hearing was held in response to Phillip's two earlier requests for a hearing. PEX 72. A written decision was provided by the hearing officer 17 days later, on April 12, 1996. PEX 72. Despite the fact that the IDEA, District of Columbia regulations and DCPS policy dictate that a due process hearing be held and a written decision be provided within 45 days of a request, approximately 104 days passed between Phillip's first request and the date of his hearing, and approximately 121 days passed before he received a written decision. Burch Tr. 217–21; PEX 72.

37. At the hearing on March 26, 1996, Phillip argued that DCPS failed to conduct an appropriate annual review of his IEP for the 1994–95 school year, that it failed to timely complete an IEP for the 1995–96 school year, that DCPS failed to hold a timely due process hearing, and that DCPS failed to find a Level IV placement for Phillip as recommended in his December 8, 1995, IEP. PEX 72. Phillip sought an official placement and funding at the Kennedy Institute, compensatory education, compensatory damages and punitive damages. PEX 72.

38. The hearing officer denied Phillip's request for compensatory and punitive damages because it was not within the purview of the hearing officer to award damages and because the IDEA makes no provision for such damages. PEX 72. After finding that Phillip was a special education student who had been denied a free and appropriate public education for at least one and a half school years, and after hearing testimony that placement at Kennedy would be appropriate for Phillip, the hearing officer concluded that the Kennedy Institute was an appropriate placement and ordered that DCPS place and fund Phillip at Kennedy retroactive to his matriculation in February 1996. PEX 72; Burch Tr. 236–38. The hearing officer also directed that Phillip receive an occupational therapy evaluation, neurological screening, and two years of compensatory education. PEX 72; Holmes Tr. 513–14.

39. Dr. Gail Hilliard–Nelson, who became principal at Kennedy during Phillip's time there, testified that she believed that Phillip's placement at Kennedy was an appropriate one and that his IEP was being implemented at Kennedy. Hilliard–Nelson, Tr. 198. Both Phillip's aunt and mother agreed that the new placement was appropriate and believed that Phillip's academic performance improved once he started at Kennedy. Jackson Tr. 313; R. Walker Tr. 368–70.

40. In September 1996, Norma Jackson became Phillip's appointed guardian after a District of Columbia Superior

Court proceeding in which Ms. Walker was found to have neglected Phillip. Jackson Tr. 316–18; R. Walker Tr. 361–62; DEX 13A; DEX 14. Ms. Jackson became Phillip's legal guardian in part because of Ms. Walker's drug problems. R. Walker Tr. 356–58, 361–65; DEX 14 (stipulation between Rosella Walker and the Government of the District of Columbia in which Ms. Walker admits to a "history of drug history which impedes her ability to provide [Phillip] with appropriate care and attention"). Ms. Jackson remained Phillip's legal guardian until May 1997, when he was committed into the Government of the District of Columbia foster care system. DEX 13B.

41. Phillip's behavior while attending Kennedy was often "distractible, compulsive," and he exhibited "verbal aggression and hostility sometimes with staff people." Hilliard–Nelson, Tr. 194. Dr. Hilliard–Nelson testified that Phillip was often "frustrated" and had "attendance problems"—coming to school late or not coming at all one or two days a week. Hilliard–Nelson, Tr. 194–95. Phillip also was suspended from Kennedy on several occasions because of his behavioral problems. Hilliard–Nelson Tr. 199. Dr. Hilliard–Nelson believed that these behavioral problems were attributable to Phillip's home life and to his frustration at having such poor academic skills at such an advanced age. Hilliard–Nelson, Tr. 194–95, 198–202, 207–209.

42. Despite receiving individual counseling at Kennedy from a licensed clinical social worker, as well as group counseling and intervention counseling because of his behavioral problems, in September 1997 Phillip had to be admitted to Riverside Psychiatric Hospital because he was threatening Kennedy staff and fighting with his peers. DEX 7; DEX 8; DEX 9; DEX 10; Hilliard–Nelson, Tr. 198–200. At the time of his admission to Riverside, Phillip admitted to marijuana use over the previous three years. DEX 7, DEX 8. Phillip remained at Riverside until at least December 1997. DEX 9.

43. In September 1999, Phillip left the Kennedy Institute of his own volition but did not inform the school. Hilliard–Nelson Tr. 196–97; R. Walker Tr. 368. Phillip testified that he left because of problems he was having with fellow students. P. Walker Tr. 32–33. When the Kennedy Institute noticed that Phillip stopped attending class, it filed a truancy report and contacted Phillip's lawyer, Paul S. Dalton. Hilliard–Nelson Tr. 197; DEX 36. Mr. Dalton then informed the Kennedy School that Phillip was not in class because he had enrolled in Lindamood–Bell Learning Center. Hilliard–Nelson Tr. 197; R. Walker Tr. 368.

## II. FINDINGS OF FACT REGARDING CUSTOMS, PRACTICES AND POLICIES OF DCPS [4]

Sharon Raimo, the Executive Director of St. Coletta's School, a private school located in Virginia that provides special education services to students from the greater D.C. area, testified regarding her experience with DCPS and gave her opinion of DCPS's customs, policies and practices. St. Coletta's is a relatively small school that in 1993 had 20 students, 12 of whom were District of Columbia residents referred by DCPS (most of them being referred as a result of due process hearing officer determinations). Based upon

4. Because plaintiffs allege that DCPS violated the IDEA with respect to Phillip from 1986 through 1995, only testimony and evidence addressing DCPS's customs, policies and practices within that time frame is relevant to this case. Testimony and evidence related to other time periods therefore is not addressed and will not be considered by the Court.

her experience reviewing referrals to St. Coletta's and speaking with parents and child advocates who endeavored to get DCPS to place their children at St. Coletta's, Ms. Raimo testified that from 1993 to 1995 DCPS routinely violated evaluation and testing deadlines, failed to hold tri-annual re-evaluations, failed to hold timely due process hearings, and failed to send representatives to IEP meetings held at St. Coletta's.

Michael Snipes, a DCPS employee from 1973 to the present, was the Director of the DCPS Assessment Center (1986–88) and the Assistant Director of the DCPS Division of Special Education (1988–1995). Mr. Snipes was involved in collecting information regarding DCPS's compliance with the IDEA for a Compliance Agreement that the District of Columbia entered with the United States Department of Education in March 1998. Mr. Snipes testified that the Compliance Agreement was entered, at least in part, as a recognition of DCPS's failure to comply with certain portions of the IDEA. He asserted, however, that the goal of the agreement was not to catalogue possible violations of the IDEA, but to allow DCPS a sufficient opportunity to implement improvements throughout the Division of Special Education.

Mr. Snipes testified that DCPS was not providing a free appropriate public education to every identified special education student in the District of Columbia in 1988. He also testified that in 1988 DCPS was not in full compliance with the *Mills* Decree requirements for the timely evaluation of students, for developing IEPs and for placing students; with the IDEA's requirement that a representative of DCPS attend every IEP meeting held for every student in the District of Columbia; with the statute's requirement that DCPS place all special education students in the least restrictive environment; or with the IDEA's procedural safeguards.

Mr. Snipes also testified about internal DCPS compliance monitoring reports from 1991 to 1996, *see* PEX 1–5, and about similar reports done by the United States Department of Education, Office of Special Education Programs, in 1980, 1988 and 1993. *See* PEX 6–8. He testified that the reports, all of which summarized monitoring of DCPS's compliance with the requirements of the IDEA, were designed to identify the District's deficiencies and permit DCPS the opportunity to come into compliance with the IDEA. Mr. Snipes emphasized that the reports did not provide comprehensive reviews of the state of the District of Columbia's schools in any given year, but instead amounted to generalizations based on samplings of a percentage of DCPS schools. The 1992–93 external report, for example, reviewed 1,918 students and 34 schools out of about 7,000 total students and 158 schools in the DCPS system. *See* PEX 4. Mr. Snipes testified that the primary goal of the internal and external monitoring reports was to identify deficiencies and to provide a means for correcting those deficiencies.

Jeff Myers, DCPS Acting Director of Special Education for one year in 1998, also was called to testify regarding DCPS's customs, policies and practices. Mr. Myers had a substantial role in drafting the 1998 Compliance Agreement with the United States Department of Education. Mr. Myers testified about DCPS's poor compliance with the IDEA's child find requirement, its problems holding initial evaluations and re-evaluations, its difficulties meeting the *Mills* Decree deadlines, the backlog of due process hearing requests, and the timeliness with which DCPS placed students once a placement was recommended. Because Mr. Myers' testimony only covered DCPS's compliance

with the IDEA during 1997 and 1998, it is irrelevant to this case. Mr. Myers did, however, confirm Mr. Snipes' characterization of the Compliance Agreement as a document intended not as a laundry list of past violations, but as a snapshot of a single point in time for use by DCPS in attempting to improve the provision of special education services in the District of Columbia.

Further testimony regarding DCPS's customs, policies and practices was offered by Gail Hilliard–Nelson, an administrator at the Kennedy Institute from 1983 to 1994 and from 1996 to the present and an appointed member of the State Advisory Panel for Special Education in the District of Columbia from 1997 to the present. Dr. Hilliard–Nelson spent her two years away from the Kennedy Institute from 1994 to 1996 as the director of For Love of Children ("FLOC"), a private nonprofit learning program. Based on her experience in these positions and on her education (a bachelors degree in special education, a masters degree in rehabilitation counseling and a doctorate degree in education), the Court accepted Dr. Hilliard–Nelson as an expert in special education. Based on her experience reviewing referrals to the Kennedy Institute, Dr. Hilliard–Nelson testified that from 1986 to 1995 DCPS failed to comply with the IDEA's initial evaluation and testing requirements, often failed to comply with the IDEA's requirement for timeliness for assessments and placements, and often failed to hold timely due process hearings. Dr. Hilliard–Nelson also testified that DCPS typically held tri-annual evaluations of students two or three years (and in some cases up to seven years) late.

Dr. Robert Burch, the Director of DCPS's Student Hearing Office for all years relevant to this case, testified that he organized and supervised the IDEA due process hearing system, which was one of seven types of hearings that the office administered. Dr. Burch testified that from 1986 to 1995 the hearing office was unable to hold hearings within the IDEA's time limits because of exponential increases in the number of parents and attorneys requesting hearings coupled with an insufficient number of hearing officers and DCPS attorneys. He testified that while due process hearing requests involving alleged timeline violations were processed quickly and often would satisfy or come close to satisfying the 45 day timeline, requests involving "appropriateness" issues (including transportation, compliance with IEPs, placement disputes, etc.) often resulted in determinations being issued well beyond the 45 day time limit. Dr. Burch further testified that he notified his DCPS supervisors and DCPS attorneys of these problems on numerous occasions and made suggestions for reducing the growing backlog of hearing requests, but few if any of his suggestions were ever implemented and the backlog grew very large. Dr. Burch testified that while delays in holding due process hearings existed during the time period relevant to this case, such delays were not intentional and never resulted in a delay so long that it resulted in a student failing to receive a due process hearing if he or she wanted one. It was not futile to request a due process hearing; if a student requested a hearing, the student eventually would get one.

The final witness testifying with respect to DCPS's customs, policies and practices was Elizabeth White, DCPS's Special Education Instructional Supervisor for all Region C special education programs from 1986 to 1994, and Instructional Supervisor on a city-wide instructional team from 1994 to 1998. Region C covered about 100 schools and 1,000 students. Ms. White testified that in her experience, from 1986

to 1995 DCPS often failed to meet IDEA timelines with respect to initial testing, failed to hold timely IEP meetings, failed to make timely placements based on IEP recommendations, failed to notify parents of and include them in annual IEP meetings, failed to hold timely tri-annual evaluations, and failed to hold timely due process hearings. Ms. White said that she made occasional recommendations to her supervisors to improve some of these problems, but that her recommendations were never fully implemented.[5]

Based on the testimony of Ms. Raimo, Mr. Snipes, Dr. Hilliard–Nelson, Dr. Burch and Ms. White, the Court finds that from 1986 to 1995 DCPS often—if not routinely—failed to provide timely evaluations and assessments, timely due process hearings and timely placements of students in appropriate programs or settings.

## III. EXPERT TESTIMONY

The parties called several expert witnesses to opine on Phillip's disability or mental condition, on the effect that his home life had on his education, and on what amount of damages, if any, is appropriate in this case.

### A. Phillip's Disability or Mental Condition and the Effects of his Home Life

Dr. Raphael Minsky, who was accepted by the Court as an expert in the field of rehabilitation psychology, conducted a psychological evaluation of Phillip in February and April of 1998 at the request of plaintiffs' counsel. After reviewing Phillip's history, interviewing and testing him, Dr. Minsky came to the conclusion that "Phillip was not mentally retarded and that he was severely academically impoverished

and that he had serious and severe learning problems which occurred early in his life which prevented him from acquiring the basic academic skills requisite with progressing from a pre-school level to higher levels of functioning." Minsky Tr. 388–90. Dr. Minsky also called into question Dr. Frank Grant's 1991 diagnosis of Phillip as mentally retarded and Dr. Richard Ruth's similar diagnosis in 1998.

Dr. Raymond Holmes, who is not a psychologist, was also called by plaintiffs to challenge DCPS's psychologists' diagnoses of Phillip. He was accepted by the Court as an expert in learning disabilities, mental retardation and special education generally. Based on a review of Phillip's records and particularly on his experience as principal of the Kennedy Institute during part of the time Phillip attended the school, it was Dr. Holmes' opinion that Phillip was not mentally retarded and that his IEPs were inappropriate because of that misclassification. Dr. Holmes also called into question the diagnoses of mental retardation made by Dr. Grant in 1991 and Dr. Carole Barksdale in 1995.

Dr. Macletus Dejoie–Smith, accepted by the Court as an expert in clinical psychology, also testified for the plaintiffs regarding Phillip's disability. She did not interview or evaluate Phillip, but after reviewing Phillip's records and the reports of several experts and doctors in this case, she opined that Dr. Grant's, Dr. Barksdale's, and Dr. Ruth's diagnoses of mental retardation were wrong, and that Phillip would more appropriately be classified as "multi-handicapped." She further opined that the failure of DCPS to properly diagnose Phillip resulted in a

---

**5.** Plaintiffs also called Arlene King–Berry to testify regarding DCPS's customs, policies and practices. Shortly after she was called to testify, however, it quickly became clear that

Ms. King–Berry had no relevant testimony to offer. Her direct testimony was cut short and there was no cross-examination.

permanent injury to Phillip by preventing him from receiving appropriate IEPs, placements or services.

Dr. Richard Ruth was offered by the defendants and accepted by the Court as an expert in clinical psychology and mental retardation. Dr. Ruth evaluated Phillip in the summer of 1998, and found "with a high degree of clinical psychological certainty that Phillip Walker has mental retardation . . . ." Ruth Tr. 9. Dr. Ruth based his opinion on Phillip's records, the reports of Phillip's previous psychological evaluations and his own evaluation of Phillip. He disagreed with Dr. Minsky's finding that Phillip was not mentally retarded, primarily because "Dr. Minsky used two outdated tests," thereby "violat[ing] the standards of the profession." Ruth Tr. 15–19, 27. He also disagreed with Dr. Dejoie–Smith's opinion that Phillip was "multi-handicapped" rather than mentally retarded.

Dr. Miryam Davis, accepted by the Court as an expert in child neurology, also evaluated Phillip in September 1998 at the request of the defendants. Based on that evaluation, her review of Phillip's records and previous evaluations, Dr. Davis diagnosed Phillip as mentally retarded, mild mentally retarded, or educable mentally retarded—all three terms meaning essentially the same thing. Dr. Davis also found that Phillip suffered from "fetal alcohol effects," meaning that he likely suffered certain birth defects related to his mother's use of alcohol during pregnancy. Dr. Davis testified that Phillip's mental retardation most likely was caused by Ms. Walker's alcohol exposure around the time of his conception. She suggested that the fact Phillip's father was mentally retarded, the fact that Ms. Walker did not receive prenatal care for the first sixth months of pregnancy, and certain complications at Phillip's birth also may have caused or had an impact on his mental retardation.

Janet Burton, accepted by the Court as an expert in the field of clinical social work, was asked by the defendants to interview Phillip's mother and aunt and to review Phillip's records to determine the extent to which his home life and environment played a role in his educational progress. Based on her review of Phillip's IEPs, school reports and psychological evaluations, and on a 2 ½ hour interview with Norma Jackson and a 12 hour interview with Rosella Walker, Ms. Burton stated that it was her expert opinion that "Phillip Walker was unavailable or unable to take advantage of the opportunities that were available in the educational setting, and he was not available more likely than not because of what was going on in his home environment and in his home life." Burton Tr. 79. Ms. Burton pointed specifically to Ms. Walker's alcohol and drug addictions and the fact that she and Phillip lived with a crack dealer as the source of many of Phillip's emotional and social problems.

Having carefully considered and evaluated the expert testimony of Dr. Minsky, Dr. Holmes and Dr. Dejoie–Smith for the plaintiffs, the testimony of Dr. Grant, Dr. Barksdale Dr. Ruth and Dr. Davis for the defendants, and the written evaluations of Dr. Grant and Dr. Barksdale that were admitted in evidence—and for the reasons more fully explained in the Conclusions of Law section, *infra* at 38–41—the Court finds that DCPS did not fail to properly diagnose Phillip or to offer him appropriate placements based on the diagnoses. While Dr. Minsky's and Dr. Holmes' testimony suggest that the diagnosis of Phillip may have been a close call, the Court finds that Dr. Grant's and Dr. Barksdale's diagnoses of mental retardation, mild mental retardation or educable mental retardation

were eminently reasonable. Furthermore, the Court also finds that plaintiffs failed to prove that any diagnosis other than mental retardation would have provided placements that would have resulted in different or better educational settings for Phillip. The Court did not find persuasive the testimony of Dr. Dejoie–Smith—plaintiffs' main witness on this point—and rejects her conclusion that any misdiagnosis resulted in permanent injury to Phillip.

Finally, based on the wealth of lay and expert testimony and documentary evidence offered by the parties, the Court finds that the primary non-medical factor that had a deleterious effect on Phillip's education was his unstable, unsupportive, physically and mentally destructive home life, not the admitted failures of DCPS to satisfy certain requirements of the IDEA. A dysfunctional home life does not excuse the District from meeting its obligations under the IDEA, but it does serve as a relevant mitigating factor when determining whether the District's failures were persistently egregious or whether exceptional circumstances otherwise exist in this case, as discussed in the Conclusions of Law section, *infra* at 41–44.

### B. Damages

Plaintiffs' witness, Dr. Richard Lurito, was called to opine on the economic loss suffered by Phillip Walker as a result of DCPS's alleged failure (1) to identify in a timely fashion Phillip's learning deficits, and (2) to place him in an appropriate educational environment. Dr. Lurito was accepted by the Court as an expert in economics. Basing his expert opinion on the psychological opinion of Dr. Minsky, Dr. Lurito concluded that DCPS's actions caused a projected economic loss of

$981,154 in lost wages over the course of Phillip's lifetime.[6] Dr. Lurito did not consider the impact that further compensatory education would have on this figure because Dr. Minsky did not consider such a scenario. Dr. Charles Betsey, also accepted by the Court as an expert in economics, was asked by the defendants to review Dr. Lurito's report and to analyze the assumptions, methods and conclusions made in his report. Dr. Betsey concluded that Dr. Lurito's "estimates of Phillip Walker's lost earnings were substantially overstated," largely because of several faulty assumptions made by Dr. Lurito. Betsey Tr. 134.

Because the Court enters judgment for the defendants on the issue of liability, it is not necessary to further summarize or evaluate this economic testimony or to make any findings with respect to the amount of damages.

## IV. CONCLUSIONS OF LAW

### A. The IDEA and the Section 1983 Claim

The IDEA guarantees every disabled student a free, appropriate public education specially designed to meet his or her unique needs. *See* 20 U.S.C. § 1400(d)(1)(A). The Act establishes a variety of entitlements and procedural safeguards, including the design and implementation of an "individualized education program" ("IEP") for every disabled child, *see* 20 U.S.C. §§ 1401(11), 1414(d), and a notice and hearing process by which parents and children participate in the design and implementation of IEPs. *See* 20 U.S.C. §§ 1414(f), 1415.

---

**6.** Dr. Lurito's initially estimated that Phillip would lose $754,734 in wages. At trial, he increased that figure by 30% based on the fact that Phillip did not enroll in a four-year

remediation program, as Dr. Lurito had anticipated Phillip would do in the time period following his initial estimate.

■ Where a school system fails to provide special education or related services, a student is entitled to compensatory education. *See Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir.1991); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir.1986); *Harris v. District of Columbia*, 1992 WL 205103 (D.D.C. Aug. 6, 1992) (Lamberth, J.). Compensatory damages, on the other hand, are not available under the IDEA. As this Court has held, a plaintiff seeking money damages must bring a Section 1983 claim for damages to vindicate his or her rights under the IDEA. *Walker v. District of Columbia*, 969 F.Supp. at 795–97; *see W.B. v. Matula*, 67 F.3d 484, 494–95 (3d Cir.1995); *Zearley v. Ackerman*, 116 F.Supp.2d 109, 114 (D.D.C. 2000) (Lamberth, J.); *R.B. v. Board of Educ. of the City of New York*, 99 F.Supp.2d 411, 416–18 (S.D.N.Y.2000).[7] Asserting that providing compensatory education would not be sufficient to compensate Phillip for the alleged violations of the IDEA in this case, plaintiffs seek money damages under 42 U.S.C. § 1983.

■ As this Court has explained from the outset of this litigation, a plaintiff seeking compensatory damages for violations of the IDEA must carry a heavy burden in order to prevail. While no court has yet fully articulated what a plaintiff must prove to meet its burden, the existing case law suggests that the provision of compensatory damages is an extraordinary remedy. To prove that compensatory damages are warranted, this Court concludes that plaintiffs must satisfy a four part test.

First, plaintiffs must prove by a preponderance of the evidence that DCPS violated one or more specific provisions of the IDEA. Second, plaintiffs must prove that exceptional circumstances exist, such that the conduct of DCPS that caused the IDEA violations was persistently egregious and prevented or frustrated Phillip from securing equitable relief under the IDEA. *See W.B. v. Matula*, 67 F.3d 484, 487–95 (3rd Cir.1995), (permitting Section 1983 action for damages where school system persistently refused to evaluate, classify and provide necessary educational services to plaintiff despite "ample reliable evidence" of plaintiff's disability); *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d at 147–49 (permitting Section 1983 action for damages where school system purposefully took steps to "prevent[ ] handicapped children from gaining access to the procedural safeguards guaranteed by the statute"). Third, "[a]s in any Section 1983 action brought against a municipality, the burden is on the plaintiffs ... to establish that the District of Columbia has a custom or practice that is the moving force behind the alleged IDEA violations." *Walker v. District of Columbia*, 969 F.Supp. at 797 (citing *Monell v. Dep't of Soc. Serv.'s of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Finally, plaintiffs must show why the normal remedies offered under the IDEA—specifically, compensatory education—are inadequate to compensate Phillip for the harm that he allegedly has suffered. *See W.B. v. Matula*, 67 F.3d at 495 ("[I]n fashioning a remedy for an

---

7. *See also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (reaffirming *Matula*); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991–93 (7th Cir.1996); *Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188, 1193 n. 3 (5th Cir.1990); *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 147–49 (2d Cir.1983). *But see Padilla v. Sch. Dist. No. 1 in the City and County of Denver, Colorado*, 233 F.3d 1268, 1273–74 (10th Cir.2000); *Sellers v. Sch. Bd.*, 141 F.3d 524 (4th Cir.), *cert. denied*, 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998); *Heidemann v. Rother*, 84 F.3d 1021, 1033 (8th Cir.1996); *Crocker v. Tennessee Secondary Sch. Athletic Assoc.*, 980 F.2d 382, 386–87 (6th Cir.1992).

IDEA violation, a district court may wish to order educational services, such as compensatory education beyond a child's age of eligibility, . . . rather than compensatory damages for generalized pain and suffering.").

■ Plaintiffs have satisfied the first prong of this test for obtaining compensatory damages with respect to certain allegations made by the plaintiffs. This Court concludes, as did the hearing officer who first considered this case, that DCPS violated the strictures of the IDEA and denied Phillip a free appropriate public education when it failed to provide Phillip with an IEP for the 1994–95 school year, 20 U.S.C. § 1414(d)(4)(A); when it failed to provide Phillip with a timely IEP for the 1995–96 school year, *id.;* and when it failed to hold a due process hearing or provide a written determination in a timely manner after the requests in late 1995 and early 1996, 20 U.S.C. § 1415(f); 34 C.F.R. § 300.511(a); D.C. Mun. Reg. Tit. 5, §§ 3021.5, 3021.10 (Counts I, III and V of the Complaint). On the basis of the evidence presented at trial, however, it cannot conclude that DCPS failed to discover Phillip's disability in a timely manner (Count II); that it failed to provide Phillip with a proper placement for the 1991–92, 1992–93, 1993–94, 1994–95, or 1995–96 school years (Count IV); or that it failed to properly evaluate Phillip and failed to recommend further expert evaluations when needed (Count VI).[8]

The Court concludes that DCPS violated the IDEA by failing to provide Phillip with a 1994–95 IEP and by failing to develop a 1995–96 IEP in a timely manner because plaintiffs presented evidence to this effect and because defendants have not contested these allegations or provided evidence to the contrary. Neither side presented testimony or documentary evidence to explain why an IEP was not developed in 1994 or why it was developed late in 1995, but the facts before the Court are that there was no IEP in 1994 and a belated one in 1995. The cumulative testimony of the fact witnesses might lead one to conclude that the reason Phillip did not receive an IEP in 1994 or a timely one in 1995 was because Phillip, his mother or a child advocate was not made available for an IEP meeting, because Phillip might have stopped attending school for a period of time, or because Phillip did not reside in the District of Columbia during those years. Nevertheless, left solely with the uncontroverted evidence that Phillip did not receive an IEP for the 1994–95 school year and did not receive a timely IEP for the 1995–96 school year, the Court finds that DCPS violated the IDEA. *See* 20 U.S.C. § 1414(d)(4)(A).

Defendants similarly do not dispute that DCPS violated the IDEA's timeliness requirement for holding due process hearings when it failed to provide Phillip with a timely due process hearing during the 1995–96 school year. When Phillip's December 12, 1995 request for a due process hearing went unanswered for more than 45 days, Phillip submitted a second request on January 29, 1996. By not holding a due

---

**8.** Plaintiffs' claim that DCPS failed to provide Phillip transportation services ordered by the hearing officer (Count VII) was resolved at the early stages of this case and was not an issue at trial. *See* Tr. 46 (court's ruling that transportation count no longer relevant to this case). Plaintiffs' claim that the hearing officer erred in denying Phillip's claims for compensatory and punitive damages (Count VIII) also was resolved prior to trial. The Court ruled that the hearing officer did not err in failing to award compensatory or punitive damages to plaintiffs, as neither is contemplated under the terms of the IDEA and thus may not be granted by a hearing officer. *See Walker v. District of Columbia,* 969 F.Supp. at 797–98.

process hearing until March 26, 1996, and not delivering a written determination until April 12, 1996, approximately 104 days passed between Phillip's first request for a hearing and the date of the hearing, and approximately 121 days passed before he received a decision, meaning that DCPS unquestionably violated the procedural requirements of the IDEA. *See* 20 U.S.C. § 1415(f) (establishing right to impartial due process hearing upon request); 34 C.F.R. § 300.511(a) (requiring written determination within 45 days of request); D.C. Mun. Reg. Tit. 5, §§ 3021.5 (requiring hearing within 35 days of request), 3021.10 (requiring written determination within 45 days of request).

■ The remainder of plaintiffs' factual assertions with respect to the alleged violations were not proven by a preponderance of the evidence. Plaintiffs' assertion that DCPS failed to discover Phillip's disability in a timely manner, an allegation not made in their case before the hearing officer, simply is not supported by the testimony or evidence presented at trial. An ambiguous partial notation in Phillip's permanent record indicates that an unidentified DCPS teacher at an undisclosed point in Phillip's educational history "tried all year to get him tested," suspecting that Phillip had a "severe learning disability." DEX 3E. Ms. Walker testified that she spoke with a teacher and possibly a principal about Phillip's need for special education, but she could not recall with whom she spoke, when she spoke with them, or even what school Phillip was attending at the time. Considering both parties' failure at trial to place the comments in Phillip's permanent record into any context, Ms. Walker's inconsistent, unreliable testimony, and the fact repeatedly made clear at the trial that throughout Phillip's educational career he was rarely available to his teachers or DCPS administrators to be evaluated or monitored on a consistent basis—particularly during the 1988–89, 1989–90 and 1990–91 school years, when it is unclear whether Phillip attended school at all—the Court cannot find by a preponderance of the evidence that DCPS violated the IDEA by not discovering Phillip's disability until 1991.

■ The Court also concludes that plaintiffs failed to carry their burden of proof with respect to their claim that DCPS failed to provide Phillip with a proper placement for the 1991–92, 1992–93, 1993–94, 1994–95, and 1995–96 school years. Plaintiffs appear to rest their claim on a single factual assumption: that Dr. Grant in 1991 and Dr. Barksdale in 1995 misdiagnosed Phillip as mentally retarded, rather than learning disabled or multi-handicapped, and that this misdiagnosis was repeatedly used in IEP meetings as the basis for improper placements. More than half of the trial in this case was taken up with conflicting testimony from three expert witnesses for the plaintiffs and two expert witnesses for the defendants regarding the validity of Dr. Grant's and Dr. Barksdale's diagnoses. Indeed, one of the main reasons this Court permitted this otherwise ordinary special education case to go to trial at all, and the reason that the Court gave serious consideration to plaintiffs' extraordinary request for compensatory damages, was the allegation that DCPS was responsible for a grossly incompetent and incorrect diagnosis of Phillip as mentally retarded that led to egregiously inappropriate placements over the course of at least five school years.

The evidence at trial, however, showed that two thorough, comprehensive, professional evaluations of Phillip, performed by psychologists of unchallenged qualifications, demonstrated that Phillip was mentally retarded. It seems clear from the testimony of expert witnesses for both

sides that Dr. Grant's and Dr. Barksdale's diagnoses of mental retardation were eminently reasonable based on their interviews of Phillip, Phillip's records and Phillip's psychological test results. Plaintiffs' expert witnesses demonstrated at most that the diagnosis was a close call and that Phillip was on the borderline between mentally retarded and learning disabled. Based on the copious testimony that dominated much of the trial in this case, the Court concludes that DCPS did not fail to properly diagnose Phillip.

Equally important, even if plaintiffs had proved that Phillip was misdiagnosed—whether such misdiagnosis was grossly incompetent, reasonable based on the facts, or somewhere in between—they offered no persuasive testimony or evidence at trial that a different diagnosis would have resulted in placements that would have resulted in different or better educational settings for Phillip. Dr. Minsky, Dr. Holmes and Dr. Dejoie–Smith made the conclusory assertion that had Phillip been diagnosed as something other than mentally retarded, he would have received different and better placements. Plaintiffs failed to demonstrate through these witnesses or any other evidence, however, how the placements would have differed or how they would have offered benefits or services to Phillip that would be any more appropriate than the ones he did receive. Furthermore, it is hard for the Court to accept the contention from plaintiffs that Phillip's IEPs were inappropriate when Ms. Walker, Ms. Jackson and several child advocates signed off on and approved the very IEPs of which plaintiffs now complain.

Finally, as previously discussed, the evidence presented at trial indicated that Phillip was rarely available to be evaluated or monitored on a consistent basis. Phillip would be absent from classes for days, weeks, months and apparently even years at a time. If anything, the testimony of Phillip's teachers over the years demonstrates that DCPS went to extraordinary lengths to attempt to ensure that Phillip attended school regularly, that his mother be made aware of his academic and social deficiencies, and that he receive a proper education. On a consistent basis, these attempts were met with silence or indifference from Phillip's mother.

A typical example of this is the delay that occurred before Phillip received his tri-annual re-evaluation from Dr. Barksdale in 1995. Defendants offered uncontroverted evidence that Ms. Herndon, Phillip's teacher at Backus during the 1993–1994 school year, made repeated attempts to schedule Phillip's tri-annual evaluation, with no success. When she was finally able to communicate with Ms. Walker, she attempted to do everything she could to assist her by giving her documents that Ms. Walker would need to bring to the tri-annual evaluation in the Fall of 1994. Such evidence certainly does not indicate a failure on the school system's part to ensure timely evaluations and re-evaluations of Phillip; they suggest the opposite.

■ What the Court is left with, then, is evidence that DCPS violated the IDEA and denied Phillip a free appropriate public education in only three ways: by failing to develop an IEP for the 1994–95 school year, by failing to develop a timely IEP for the 1995–96 school year, and by failing to hold a timely due process hearing during the 1995–96 school year. Such procedural violations of the IDEA are traditionally remedied with compensatory education such as the hearing officer ordered in this case. Only if a plaintiff can prove the second, third and fourth prongs of the test for compensatory damages, announced *supra* at 35–36, can plaintiffs obtain money damages for such violations of the IDEA.

Because plaintiffs fail to satisfy the second prong of the test, their request for compensatory damages must be denied.

Under the second prong, plaintiffs must show by a preponderance of the evidence that exceptional circumstances exist in this case, such that the conduct of DCPS that caused the IDEA violations was persistently egregious and prevented or frustrated Phillip from securing equitable relief under the IDEA. *See W.B. v. Matula,* 67 F.3d at 487–95; *Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d at 147–49; *see also Monahan v. Nebraska,* 687 F.2d 1164, 1169 (8th Cir.1982) (stating that private right of action for damages under the IDEA may be appropriate where "exceptional circumstances" exist); *Miener v. Missouri,* 673 F.2d at 979–80 (positing that "exceptional circumstances" might exist where the school system's conduct put child's physical health at risk or where the defendants "acted in bad faith by failing to comply with the procedural provisions of [the IDEA] in an egregious fashion").

Here, despite repeated assertions by plaintiffs' counsel that they would show persistent, egregious behavior by DCPS with respect to Phillip's education, no such testimony or evidence was produced at trial. As noted above, plaintiffs failed to prove by a preponderance of the evidence that most of the alleged violations of the IDEA took place at all, let alone that the conduct of DCPS with respect to the alleged violations was persistently egregious. With respect to the three violations of the IDEA that plaintiffs did prove—failure to provide a 1994–95 IEP, failure to provide a timely 1995–96 IEP, and failure to hold a due process hearing within the statutory time period when requested in late 1995 and again in early 1996—plaintiffs failed to show the existence of exceptional circumstances that would distinguish this case from the garden variety IDEA case in which a school district fails to provide an appropriate, timely IEP or fails to hold a timely due process hearing. While such violations are to be taken seriously because of their potentially "devastating impact on a child's well being," *Blackman v. District of Columbia,* 185 F.R.D. 4, 7 (D.D.C.1999), the remedies of specific performance and/or compensatory education provided by the IDEA itself generally are all that the law provides.[9]

Prior to trial, plaintiffs led the Court to believe that the particularly egregious conduct that they would prove would take the form of a misdiagnosis that directly affected Phillip's placement and IEPs from the very beginning of his schooling or, alternatively, a practice of copying Phillip's IEPs from year to year without holding annual IEP meetings or considering Phillip's changing needs. As noted, however, plaintiffs failed to demonstrate at trial that Phillip was misdiagnosed or that such a misdiagnosis (if there was one) led to inappropriate placements. Indeed, on the last day of trial plaintiffs' counsel explained that this was no longer a central theory of their case (if it ever had been). *See* Sept. 27, 2000 Tr. 44–47.

---

9. As the Court said in *Blackman:* "Any agency whose appointed mission is to provide for the education and welfare of children fails that mission when it loses sight of the fact that, to a young, growing person, time is critical. While a few months in the life of an adult may be insignificant, at the rate at which a child develops and changes, especially one at the onset of biological adolescence with or without special needs like those of our plaintiff, a few months can make a world of difference in the life of that child." *Blackman v. District of Columbia,* 185 F.R.D. at 7 (quoting *Foster v. District of Columbia,* Civil Action No. 82–0095, Memorandum Opinion and Order of February 22, 1982, at 4 (D.D.C.) (J.H. Green, J.)).

Plaintiffs also failed to prove that DCPS engaged in persistent, egregious conduct that violated the IDEA when it allegedly copied Phillip's IEP from year to year. As Ms. Herndon confirmed in her testimony, a portion of Phillip's 1993–94 IEP was photocopied solely for the benefit of Ms. Walker in her upcoming meeting with the psychologist scheduled to perform Phillip's tri-annual evaluation, so that she would be able to give the psychologist a better understanding of the current state of Phillip's education.

At bottom, the evidence at trial demonstrated that this case is no different from the unfortunate multitude of others in this district in which, through the denial of certain procedural rights guaranteed by the IDEA, DCPS failed a young disabled student more than once and deprived him for a time of a free and appropriate public education. The remedy for such a failure, however, is compensatory education, not compensatory damages. Plaintiffs have failed to meet the stringent test required to demonstrate that this is one of those rare cases where damages are appropriate, and their claim for compensatory damages under Section 1983 for violations of the IDEA therefore must be rejected.[10]

### B. Rehabilitation Act Claim

■ Plaintiffs also seek compensatory damages for alleged violations of Section 504 of the Rehabilitation Act. This Court has found that damages may be available to a plaintiff able to prove a violation of the Rehabilitation Act. *See Walker v. District of Columbia,* 969 F.Supp. at 797–98; *see also Heidemann v. Rother,* 84 F.3d at 1032; *W.B. v. Matula,* 67 F.3d at 494; *cf. Dorsey v. Department of Labor,* 41 F.3d 1551, 1554 (D.C.Cir.1994) (characterizing the issue of whether compensatory damages are available under the Rehabilitation Act as "not entirely settled").

■ In order to state a claim under Section 504 of the Rehabilitation Act, a plaintiff must show that he or she was discriminated against "solely by reason of his [or her] handicap." 29 U.S.C. § 794; *see Walker v. District of Columbia,* 969 F.Supp. at 797; *Heidemann v. Rother,* 84 F.3d at 1032. In the context of children who receive benefits pursuant to the IDEA, the D.C. Circuit has noted that " 'in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the 'free and appropriate education' required by the [IDEA] must be shown.' " *Lunceford v. District of Columbia Bd. of Educ.,* 745 F.2d 1577, 1580 (D.C.Cir.1984) (quoting *Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir.1982)). "[E]ither bad faith or gross misjudgment should be shown before a § 504 violation can be made out ...." *Monahan v. Nebraska,* 687 F.2d at 1171. Liability will not be imposed so long as the "state officials involved have exercised professional

---

**10.** Because plaintiffs failed to meet the second prong of the test for compensatory damages with respect to any of its allegations against DCPS, the Court need not address the third and fourth prongs. The Court nevertheless notes that plaintiffs' attempt to rely on the Court's finding of a custom and practice in *Blackman v. District of Columbia,* Civil Action No. 97–1629, is unavailing. The Court in *Blackman* found only that the two classes of plaintiffs in that case had submitted evidence "sufficient to establish that the District of Columbia, faced with clear violations of the IDEA over a number of years, has displayed deliberate indifference to plaintiffs' rights" to timely due process hearings, timely implementation of determinations of hearing officers and implementation of settlement agreements. *See* Opinion of June 3, 1998, at 15–17. The customs and practices alleged in this case involve mostly different violations of the IDEA occurring over a period of time completely different from that in *Blackman.* In short, the Court's findings in *Blackman* would not satisfy plaintiffs' burden in this case.

judgment, in such a way as not to depart grossly from accepted standards among educational professionals." *Id.*

■ For the reasons stated *supra* at 36–44, the Court finds that plaintiffs have failed to show that DCPS discriminated against Phillip solely by reason of his disability or that DCPS did anything more than fail to provide Phillip with a free and appropriate public education as required by the IDEA. Plaintiffs have not shown that the conduct of DCPS constituted bad faith or gross misjudgment. The testimony of Phillip's teachers demonstrated a good faith attempt on the part of DCPS to provide Phillip with a free and appropriate public education, and the weight of the expert testimony indicated that DCPS's psychologists exercised sound, reasoned professional judgment that in no way departed from the accepted standards of their profession. For these reasons, the Court concludes that plaintiffs' claim for compensatory damages under the Rehabilitation Act also is without merit.

## V. CONCLUSION

The IDEA provides a comprehensive set of procedures both to attempt to assure that an appropriate public education is provided to a disabled student and to redress any failures to follow those procedures or provide the appropriate education in a timely manner. Those procedures were invoked by plaintiffs in this case at the administrative hearing level. Phillip was awarded all that was due to him by an independent hearing officer based on the violations that he could prove: the guarantee of an appropriate placement and compensatory education to redress the educational deprivation that he suffered at the hands of the District of Columbia.

Only in the most extraordinary of circumstances is a claim for compensatory damages under Section 1983 for violations of the IDEA appropriate. Only in the rarest of cases will a plaintiff be able to prove that a school system's conduct is so persistent and egregious as to warrant such a unique remedy not otherwise provided for by the IDEA itself. Based on the testimony and documentary evidence presented at trial, the Court concludes that plaintiffs have not carried their burden of proving by a preponderance of the evidence that this is one of those cases. A Final Judgment consistent with this Opinion will issue this same day.

SO ORDERED.

### *FINAL JUDGMENT*

Based on the evidence and testimony presented at trial, and for the reasons set forth by the Court in its Opinion, Findings of Fact and Conclusions of Law issued this same day, it is hereby

ORDERED that because plaintiffs have failed to prove their case by a preponderance of the evidence at trial before this Court, JUDGMENT is entered for all defendants on all counts of the complaint; and it is

FURTHER ORDERED that any pending motions not resolved by this Final Judgment are DENIED as moot.

This is a final appealable judgment. *See* Rule 4(a), Fed. R.App. P.

SO ORDERED.