Anna SCHOENBACH, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

No. CIV.A. 02–02034(HHK).

United States District Court, District of Columbia.

March 25, 2004.

Haylie Michelle Iseman, Michael J. Eig, Michael J. Eig & Associates, PC, Chevy Chase, MD, for Plaintiffs.

Maria L. Merkowitz, Assistant Corporation Counsel, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, Anna Schoenbach ("Anna"), a minor with Asperger's Syndrome and Attention Deficit and Hyperactivity Disorder, and her parents Andrew Schoenbach and Daryl Kade ("Anna's parents"), appeal a District of Columbia Public Schools ("DCPS") hearing officer's decision that they are not entitled to reimbursement for tuition incurred in sending Anna to the Kingsbury Day School. Defendants are the District of Columbia and Paul Vance, former Superintendent of DCPS, sued in his official capacity. Plaintiffs allege that the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400–1461, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and 42 U.S.C. § 1983 provide the bases for obtaining the relief they seek.

Before this court are the parties' cross-motions for summary judgment. Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that defendants' motion should be granted and plaintiffs' motion should be denied.

## I.  BACKGROUND

### A.  IDEA Background

Congress passed IDEA to "ensure that all children with disabilities have available

to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). IDEA provides funding and assists states in implementing a "comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families." 20 U.S.C. § 1400(d)(2). In order to receive funding under IDEA, states must also ensure that "[a]ll children with disabilities residing in the State, including children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.125(a)(1)(i). IDEA's free appropriate public education ("FAPE") provision entitles each disabled student to an individualized education program ("IEP"), educational services tailored to the unique needs of each disabled child. 20 U.S.C. § 1414(d)(2)(A) ("At the beginning of each school year, each [state] shall have in effect, for each child with a disability in its jurisdiction, an individualized education program."); 34 C.F.R. § 300.300(a)(3)(ii).

A full evaluation of a child is an integral part of developing an appropriate IEP. Therefore, IDEA requires states to "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1400(d)(2). Once a child has been evaluated and identified as disabled, the school district must annually create an IEP tailored to the disabled child's needs. The IEP is developed in a periodic, but no less than annual, meeting of an IEP team including parents, faculty, and evaluators. 20 U.S.C. § 1414(d)(1)(B). The IEP must meet a number of standards set out in 20 U.S.C. § 1414(d)(1)(A).

By definition, a "free" appropriate public education means that services, including evaluations, must be "provided at public expense, under public supervision and direction, and without charge." 20 U.S.C. § 1401(8)(A). If the proposed educational services cannot be provided by the school district, the IDEA requires the child's placement in a private school at public expense. 20 U.S.C. § 1413(a)(4). Parents who disagree with their child's evaluation or placement may request an administrative hearing, before an impartial hearing officer, to challenge the IEP. 20 U.S.C. § 1415(b)(2). The hearing officer's determination ("HOD") may be challenged in federal district court. 20 U.S.C. § 1415(e)(2).

## B. Factual Background

Anna Schoenbach, now thirteen years old, attended Murch Elementary School ("Murch") from kindergarten through the fifth grade-through the 2001–02 school year. At the end of third grade, Anna had some psychological evaluations, which indicated the presence of a learning disability in fine motor skills, an anxiety disorder, Oppositional Defiant Disorder, and a provisional diagnosis of ADHD (Inattentive Type). Terry Edelstein & Lynnwood Andrews, Psychological Assessment: Anna Schoenbach at 2 (Dec. 19, 2001) (Bates No. 90) ("Edelstein Report") (discussing Anna's diagnosis history). DCPS provided her with a Section 504 plan pursuant to the Rehabilitation Act, but not for IDEA services. Anna's last Section 504 plan, revised in September 2001, provided for certain classroom accommodations (e.g., "reducing homework," "allowing student to tape record lessons") and prescribed medication for Anna's ADHD. *See generally* Section 504 Plan (Sept. 28, 2001) (Bates Nos. 66–68).

Despite the Section 504 plan, Anna continued to have problems. In October 2001, Anna's parents made arrangements to have Anna evaluated by psychologists, Dr. Terry Edelstein and Dr. Lynnwood Andrews, "due to her difficulties with social interactions, anxiety, oppositional behavior and problems in school." Edelstein Report at 1 (Bates No. 89). Dr. Andrews confirmed the ADHD diagnosis but also found that Anna had Asperger's, an autism-spectrum disorder that combines high cognitive ability with impairment of social relations and restrictive, repetitive patterns of behavior. See id. at 5 (Bates No. 93). Anna's parents gave DCPS the report, which a DCPS-hired psychologist reviewed and largely agreed with. See Ada E. Vincent, Review of Clinical Psychological Evaluation at 4 (Feb. 15, 2002) (Bates No. 72) (noting that tests conducted by Edelstein and Andrews "indicate a chronic pattern of social withdrawal, social skills deficits regarding poor nonverbal communication and perception of nonverbal cues, and poor peer relations, and a restricted range of interests with intense preoccupation consistent with mild Asperger's Disroder.").

On February 19, 2002 and March 26, 2002, DCPS held IEP meetings with a multidisciplary team ("MDT") consisting of Anna's parents, DCPS officials, Anna's teachers at Murch, and psychologists. Based on the Edelstein Report and input from Anna's Murch teachers and parents, the team agreed that Anna was eligible for special educational services under IDEA. Most of the team agreed that Anna should be eligible for IDEA services under the category of "autism," although Anna's parents objected, arguing that she should also be eligible under another category as well. Initial IEP Notes at 3 (Mar. 26, 2002) (Bates No. 147). This is the sole instance, on the record, of Anna's parents objecting to anything at the IEP meetings. See generally Initial IEP Notes (Bates Nos. 23–24, 25–26, 143–47, 148–49). The team also agreed that Anna should receive one hour of specialized instruction and thirty minutes of counseling every week, and, in addition, that DCPS should hire a full-time, in-class aide to assist Anna. See Initial IEP at 1, 10 (Mar. 26, 2002) (Bates Nos. 133, 142). The parents took the IEP home. Plaintiffs apparently had every opportunity to request changes and make objections, and any changes they did request were incorporated into the Initial IEP. See Tr. at 39 (Test. of Scott Cartland) (indicating that Cartland, assistant principal at Murch, worked with Anna's parents on the Initial IEP, and that he "worked particularly with Mr. Schoenbach to ... draft" the IEP); see id. at 40 (noting that "any requests for goals and objectives or services for Anna made by the parents" were included in the Initial IEP). Nothing appears to have stopped Anna's parents from requesting different goals than those in the Initial IEP or recommending a private placement.

On April 4, 2002, Anna's parents signed and submitted the proposed IEP along with a letter stating that they accepted the IEP for the remaining months of the 2001–02 school year, but that otherwise they felt the IEP inadequate. See Schoenbach & Kade Ltr. to Cartland (Apr. 4, 2002) (Bates No. 132). They claimed that the proposed IEP failed to provide

small group instruction available daily across all subject areas, staff knowledgeable about children with severe social disabilities, training integrated into the wider curriculum, small structured and supervised activity groups, and an individualized educational plan that allows Anna to practice new skills and demonstrate her competency within the confines of her limited range of interests-in summary, a "coordinated social, commu-

nications, and adaptive skills curriculum and behavior management approach."

*Id.* The letter reflected, and in places parroted, the concerns listed in the Edelstein Report. *Compare id. with* Edelstein Report at 8 (Bates No. 96).[1] Anna's parents claim that they signed the Initial IEP "to get something in place as soon as possible for the remainder of the school year." *Id.* The letter itself, however, contained no request for a private school placement, and no attempt to notify DCPS that they had applied to private schools. *See id.*

On April 12, 2002, plaintiffs submitted DCPS a letter indicating that Anna had been accepted at the Kingsbury Day School, a private school for disabled children, for the 2002–03 school year. The letter simply announced, as fact, that Anna would attend Kingsbury:

> While the family has agreed to permit DCPS to implement the proposed IEP through the remainder of the current school year, we remain skeptical that the IEP and placement will be sufficient to meet Anna's unique and complex needs. In compliance with the notice requirements of IDEA, DCPS is hereby advised that my clients *will* execute a tuition contract with Kingsbury Day School on or about April 30, 2002, with enrollment scheduled for September, 2002.

Gruber Ltr. to Gay (Bates No. 87). Anna remained at Murch until the end of the 2001–02 school year. While Anna's Initial IEP called for a full-time aide starting just after April 4, 2002, it was not until May 20, 2002 that an aide started working with Anna in the classroom. Tr. at 93 (Test. of Andrew Schoenbach). Mr. Schoenbach's uncontroverted testimony indicates that the aide was unqualified and, in short, a "disaster." *See id.* at 91 (noting that the aide "had just finished high school; had had no training in education, let alone special education, no training in tutoring; and clearly had had no experience or training in dealing with a child with a complex emotional problem"); *id.* at 93 ("It was an absolute disaster. Despite our discussions, the aide interpreted her responsibility as-I can only call it harassment.").

In July 2002, plaintiffs requested a due process hearing, alleging that Anna's IEP was inappropriate and was not even implemented as written. Request for Hearing at 2 (July 3, 2002) (Bates No. 85). Plaintiffs requested "that DCPS be ordered (or agree) to place and fund Anna at Kingsbury for school year 2002–03, with tuition, related services, and transportation." *Id.* DCPS held a hearing before an impartial officer on September 9, 2002. *See generally* Tr. The hearing officer denied plaintiffs' request for relief, finding that DCPS "developed an appropriate IEP that provides educational benefits to Anna, that it has implemented that IEP and that Murch is an appropriate placement for Anna." Hearing Officer's Determination at 5 (Sept. 17, 2002) ("HOD"). One month later, plaintiffs timely filed the present action.

## II. ANALYSIS

### A. Legal Standard

Normally, under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those

---

1. "Anna will require a school placement where she has a small, highly structured classroom with extensive opportunity for individual attention, use of individualized learning approaches, and small group work with a multi-disciplinary staff knowledgeable about the specific needs of children with Asperger's Disorder." *Id.* at 8 (Bates No. 96).

"that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

In IDEA cases, however, a district court shall review the administrative record, hear additional evidence presented at the request of the parties, and based "on the preponderance of the evidence *shall grant such relief as the court determines is appropriate*." 20 U.S.C. § 1415(e)(2) (emphasis added). In making this assessment, a district court is to give the hearing officer's determination "due weight." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (holding that § 1415(e) "carries with it the implied requirement that due weight shall be given to" the administrative proceedings). The "due weight" standard of review does not rise to the level of *de novo* review because "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207, 102 S.Ct. 3034. Less weight is due to a hearing officer's decision for matters not involving educational expertise "because a federal court is just as well suited to evaluate the situation." *See Kings Local Sch. Dist. Bd. of Educ. v. Zelazny*, 325 F.3d 724, 728 (6th Cir.2003); *accord McKenzie v. Smith*, 771 F.2d 1527, 1535 n. 17 (D.C.Cir.1985).

It is also well-settled that the "party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C.Cir.1988). Furthermore, "a court upsetting the [hearing] officer's decision must at least explain its basis for doing so." *Id.*

Finally, the Supreme Court has defined the remedial authority of district courts under § 1415(e) as "confer[ing] broad discretion on the court. The type of relief is not further specified, except that it must be 'appropriate.' Absent other reference, the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

**B. Public School Placement**

■ Under IDEA, parents who unilaterally decide to place their disabled child in private school, without consent of local school officials, "do so at their own risk." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (quoting *Burlington*, 471 U.S. at 372, 105 S.Ct. 1996). Parents may receive tuition reimbursement if a court finds that (1) "the public placement violated IDEA" *and* (2) "the private school placement was proper under the Act." *Id.* at 15, 114 S.Ct. 361. The first factor is a threshold condition, for if the public school placement would have been appropriate, the analysis ends, and a disabled child's parents are not entitled to reimbursement. 20 U.S.C. § 1412(a)(10)(C)(i) (indicating that IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made [FAPE] available to the child and parents elected to place the child in such private school or facility."); *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir.2000) ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question."); *T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 582 (3d Cir.2000) ("The threshold

question here focuses on the first prong- viz., whether the Board's proposed placement violated the IDEA .... The parental reimbursement mandate comes into play only if we answer yes to this initial question.").

The threshold question in this case is whether Anna's proposed public school placement at Murch was appropriate. This inquiry turns on two further sub-issues: (1) whether DCPS has complied with IDEA's administrative procedures and (2) whether or not the IEP generated by the MDT was reasonably calculated to provide some educational benefit to Anna. *See Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *Zearley v. Ackerman,* 116 F.Supp.2d 109, 113 (D.D.C.2000).

### 1. Compliance With IDEA Procedures

A school district must comply with the procedural requirements and safeguards listed in 20 U.S.C. § 1415.[2] Though their briefs do not identify them as such, plaintiffs raise two procedural arguments: (1) that DCPS failed to provide a complete and accurate transcript of the due process hearing, Compl. ¶¶ 60–61; (2) that DCPS failed to meet its burden of proving Anna's IEP adequate, largely because the hearing officer misapplied the burden of proof in his decision. Compl. ¶ 72; *see* Pl.'s Mot.

for Summ. J. at 16. The court finds these arguments meritless.

■ Claims of procedural violations of IDEA do not, in themselves, inexorably lead a court to find a child was denied FAPE. Most circuits[3] require plaintiffs to show substantive harm resulting from a procedural violation before finding a denial of FAPE. *See Adam J. v. Keller Indep. Sch. Dist.,* 328 F.3d 804, 811–12 (5th Cir. 2003) ("[C]ircuits that have addressed this question head on have consistently held that 'procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity' ").[4]

■ The argument that DCPS failed to provide a complete and accurate transcript fails because plaintiffs allege no substantive harm. At the request of any party to a hearing, a local educational agency must provide "a written, or, at the option of the parents, electronic verbatim record" of an administrative hearing. 20 U.S.C. § 1415(h)(3). It seems that DCPS produced the hearing transcript, *see* Defs.' Notice of Filing Record (Mar. 11, 2003) [Dkt. # 9], only after this court's order [Dkt. # 7] to do so. Nevertheless, plaintiffs do not allege any harm from DCPS's belated production of the transcript. Since plaintiffs seek retrospective relief, in the form of tuition reimbursement, it is

---

**2.** The procedural safeguards with which a local educational agency must comply with include, *inter alia,* an opportunity for parents to review all records and participate in all meetings involving the placement of their disabled child, § 1415(b)(1), the right of parents to receive written, prior notice before services under and IEP change, § 1415(b)(3)-(4), an opportunity for mediation, § 1415(b)(5), and an opportunity for parents to file complaints and receive an impartial due process hearing before the local educational agency. § 1415(b)(6)-(8); § 1415(f).

**3.** The D.C. Circuit seems not to have addressed this issue.

**4.** In *Adam J.,* the Fifth Circuit cited the following cases to support the proposition that allegations of procedural defects must be accompanied by substantive harm: *DiBuo v. Bd. of Educ.,* 309 F.3d 184, 190 (4th Cir.2002); *T.S. v. Indep. Sch. Dist. No. 54,* 265 F.3d 1090, 1095 (10th Cir.2001); *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 765 (6th Cir.2001); *W.G. v. Bd. of Trustees,* 960 F.2d 1479, 1484 (9th Cir.1992). *See Adam J.,* 328 F.3d at 812 n. 24.

unclear how more timely access to the transcript would have helped. Plaintiffs in fact referred repeatedly to the transcript in their summary judgment motion. *See generally* Pls.' Mot. for Summ. J. As a result, the court must reject this procedural argument.

■ The argument that DCPS failed to meet its burden of proof[5] also must fail. Plaintiffs do not present any direct evidence that the hearing officer misapplied the burden of proof. In *Kroot,* a sister court found probative a written statement by the hearing officer-"'[t]he burden of proof shifts to the parents once DCPS is found to have not met its burden of proof' "-that clearly "reflect[ed] a misunderstanding regarding the operation of the burden of proof." 800 F.Supp. at 982 n. 10. Plaintiffs offer no such evidence. Instead, they seem to argue that the hearing officer misapplied the burden of proof whenever he discounted evidence favorable to plaintiffs or cited evidence unfavorable to plaintiffs.

First, plaintiffs argue that DCPS failed to meet its burden by providing no *oral* testimony affirming that the 3/22/02 IEP was appropriate for Anna. *See* Pls.' Mot. for Summ. J. at 18. But the failure to provide oral testimony is not the same as providing no evidence at all. Plaintiffs cite no authority requiring DCPS to produce *oral* testimony, though it is well-established that a hearing officer may rely upon written evidence of academic progress in his decision, *see Rowley,* 458 U.S. at 203, 102 S.Ct. 3034, as the hearing officer did in this case. *See* HOD at 5 (citing academic records as evidence that Anna had made

progress over the years and that her IEP was appropriate).

Second, plaintiffs further argue that the HOD was erroneous to the extent that it gave *any* weight at all to DCPS's witnesses: "The DCPS witnesses were not competent to testify as they did, and the hearing officer offered no explanation for his decision to defer to their opinions above those of qualified experts and those who knew Anna personally." Pls.' Mot. for Summ. J. at 19. Plaintiffs fail to identify a case or applicable rule of evidence indicating which witnesses a hearing officer must find competent or incompetent. *See id.* at 19. The HOD seemed skeptical of testimony important to plaintiffs' case (especially that of Dr. Edelstein and Anna's parents), but the hearing officer provided reasons, justified by other testimonial and written evidence, for discounting their testimony. *See* HOD ¶ 5 ("Dr. Edelstein went to the IEP meeting ... but she did not participate in a discussion on the IEP goals and objectives and offered no recommendations on the IEP."); *id.* ("The parents took the developed IEP home to review."). The hearing officer was entitled to make the judgments about witnesses that he did.

Finally, those complaining of procedural violations of IDEA must also show substantive harm. *Adam J.,* 328 F.3d at 811–12. Plaintiffs contend that the hearing officer's procedural error, misapplying the burden of proof, ratified a substantively defective IEP. *See* Pls.' Mot. for Summ. J. at 23–29. This burden of proof argument is so entwined with the merits that, even if there had been a clear procedural viola-

---

**5.** Under the District of Columbia Municipal Regulations, DCPS "shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student." 5 D.C. Mun. Reg. § 3022.16; *see also Kroot v. Dist. of Columbia,* 800 F.Supp. 976, 982 & n. 11 (D.D.C.1992) (explaining § 3022.16 and DCPS's burden of proof in IDEA administrative hearings).

tion, it makes little sense to consider it separately, at least in this case.[6] That is, if Anna's Initial IEP was appropriate, then DCPS's "procedural" failure led to no harm and, therefore, no IDEA violation. If the Initial IEP was substantively inappropriate, that alone is an IDEA violation, and it is unclear what more relief plaintiffs could claim by proving a procedural mistake as well. As a result, the court finds no procedural violations of IDEA.

## 2. Educational Benefit

Plaintiffs contend that DCPS offered an inappropriate public school placement for Anna by proposing to keep her at Murch. Specifically, they argue that DCPS "neglected to propose a number of critical goals, objectives and services for this troubled student, as identified by her parents in their April 4, 2002 letter." *See* Pls.' Mot. for Summ. J. at 23. Based on the record before the hearing officer, and its obligation to give a hearing officer's decision due weight, the court would not have disturbed the HOD. However, evidence unavailable to the hearing officer-the 2003–04 IEP-indicates that the Initial IEP was inappropriate. The court therefore finds Anna's Initial IEP inappropriate.

■ The analysis of whether Anna's IEP was appropriate begins with the hearing officer's determination. *Rowley,* which the hearing officer cites in his report, HOD at 5, holds that IDEA was intended to provide a "basic floor of opportunity" and an individualized plan "designed to provide educational benefit to the handicapped child." 458 U.S. at 201, 102 S.Ct. 3034. IDEA, according to *Rowley,* impos-

es "no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Id.* at 198, 102 S.Ct. 3034; *see also Kerkam,* 862 F.2d at 886 (emphasizing that *Rowley* rejected "[i]n at least four places" the notion that a public school placement must "maximize the potential of handicapped children"). Furthermore, if a public school placement is appropriate, a school district need not consider a private placement, "even though a private school might be more appropriate or better able to serve the child." *Jenkins v. Squillacote,* 935 F.2d 303, 305 (D.C.Cir.1991). The analysis of the appropriateness of a public school placement "is not comparative." *Id.*

■ After considering oral testimony and the written record, the hearing officer found that the proposed IEP met the *Rowley* standard, finding DCPS "developed an appropriate IEP that provides educational benefits to Anna, that it has implemented that IEP and that Murch is an appropriate placement for Anna." HOD at 5. DCPS and the hearing officer relied on evidence that while at Murch, Anna had advanced in grade every year and received, in some classes, higher-than-average marks at "one of the best academically performing schools in the DCPS system." HOD ¶ 2. *Rowley* indicates that academic progress is strong, though not probative, evidence that an IEP provides educational benefit. *See* 458 U.S. at 203, 102 S.Ct. 3034 ("The grading and advancement system thus constitutes an important factor in determining educational benefit"); *but see id.* at 203 n. 25, 102 S.Ct. 3034 ("We do not hold today

---

**6.** This is not true of all allegations of procedural IDEA violations. Other kinds of procedural arguments allege substantive harms independent of the appropriateness of an IEP, for instance, failure to provide an IEP in a timely fashion even if the IEP is appropriate.

*See, e.g., Zearley,* 116 F.Supp.2d 109, 113 (finding procedural errors violated IDEA where DCPS failed to provide a timely placement, pay in a timely fashion once it provided an appropriate private placement, and perform basic administrative tasks)'.

that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"). Not only did Anna progress academically at Murch, but according to the hearing officer, the IEP "included goals and objectives on most of the issues raised by the parents and the assessment [by Drs. Andrews and Edelstein] including social-emotional, organizational skills, interpersonal social skills, coping skills, and attending skills." HOD ¶ 5. Further, the hearing officer identified evidence that Anna had made social and emotional progress. HOD ¶ 7 (finding that Murch helped reduce teasing Anna suffered to "its lowest level in fifth grade," and that Anna's father lauded Murch as "terrific" in helping Anna).

On the other hand, there is written and testimonial evidence by Drs. Andrews and Edelstein, indicating that Anna requires a small classroom setting, unavailable at Murch, to make any progress in coping with Asperger's. Edelstein Report at 9 (Bates No. 97) ("Anna requires placement in a school which has small classrooms where individual, and small group (3–4 students or fewer) is available daily across all subject areas ...."); Tr. at 135 (Test. of Dr. Edelstein) (stating that "it's not possible for [the Murch classroom curriculum] to be individualized to meet Anna's needs, in my opinion. So it's not a criticism of the teacher. It's not possible to do that in a large class that is a mainstream setting."); Tr. at 126 ("I think ... that the identification of strengths and weaknesses is fairly correct. What disturbs me ... is

that the goals are well meaning and well intended, but there is no sensitivity, from my perspective, as to what Asberger's [sic] children require."). Indeed, Dr. Edelstein testified that while Anna has progressed academically, such progress in children with Asperger's can be misleading because they cannot effectively use information they seem to have mastered.[7] Finally, testimony suggested that Anna's "social" progress at Murch-fewer students teasing her-was also deceptive, and that Anna's condition had not improved and would not improve at Murch. *See* Tr. at 131 (Test. of Dr. Edelstein) ("[Anna's] behaviors are seriously atypical. The atypicality does not allow children to embrace her."); *id.* (indicating that Murch provided "a counterproductive set of circumstances for a child who has a hopeful prognosis if the right intervention is available").

Based solely on the record before the hearing officer, the court would not overturn the HOD. The evidence based on the written record and oral testimony is mixed. On the one hand, there is the evidence that the HOD relied on to find that Murch provided the "basic floor" of educational benefit required by *Rowley*, and that the IEP placing Anna at Murch even helped with her social-emotional goals. *See* HOD ¶¶ 5 (indicating that the IEP included goals for Anna's social, emotional and interpersonal development), 7 (suggesting Anna made some social progress in 2001–02). DCPS also presented evidence by psychologists that considered a special placement outside of general education placement counterproductive. See Initial IEP Placement Notice at 2 (Mar.

---

7. "[T]hese children can be misrepresented as appearing to be achieving in a very concrete way, because they have certain aptitude and ability to be loquacious .... But ... that's misrepresentative of what they're actually able to do, specifically related to academics.... Executive function disorder is a major impairment that besets Asberger [sic] children. So they can't utilize the information that they do know. And the information is usually splinter skills, which really don't allow them to function well in reality." Tr. at 118–19 (Test. of Dr. Edelstein).

26, 2002) (Bates No. 22) (rejecting both 100% general education and 100% special education as likely to fail). On the other hand, the extensive evidence presented in the reports and testimony of Drs. Edelstein and Andrews that the Murch placement is unsuitable for Anna. Where evidence of educational appropriateness is mixed, and a court bases its ruling on same record as before the hearing officer, the court should defer to the hearing officer. *See M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers,* 231 F.3d 96, 105 (2d Cir.2000) (finding that, in a matter involving judgment about educational progress, "the district court should defer to the [hearing officer's] educational experience, particularly where ... the district court's decision was based solely on the record that was before the [hearing officer].").

However, plaintiffs present evidence-Anna's IEP for the 2003–04 school year-not available to the hearing officer when he made his decision. *See generally* Pls.' Ex. 1 (IEP Meeting Notes (July 22, 2003)) ("New IEP Notes"). The new IEP team recommends, in essence, her current Kingsbury placement. At the July 23, 2003 IEP meeting for Anna, the multi-disciplinary team[8] agreed that Anna should be placed in a full-time special educational program. New IEP Notes at 1–2. The team specifically rejected a general education setting or a combined general education with other resources (such as Anna had at Murch with the classroom aide). *Id.* at 2. The new IEP team based their decision, in part, on evidence available to the hearing officer at the due process hearing. *See id.* at 2 (Written Test. of Laura Olsen) ("After speaking with Anna's current psychologist and social worker and reviewing additional reports

made available at the last meeting, it is the opinion of this psychologist that Anna requires a full-time educational setting ....."). Nothing suggests any party objected to this finding; rather, it seems all team members agreed on a full-time special education placement, such as the one at Kingsbury.

This evidence is reason to depart from the HOD. It is not a failure to provide the HOD due weight because the New IEP Notes provided evidence unavailable to the hearing officer in September 2002. *See Justin G. v. Bd. of Educ. of Montgomery County,* 148 F.Supp.2d 576, (D.Md.2001) (indicating that a court may consider an IEP placement developed after a hearing officer's determination because such information "was not available to the parents at the time of the administrative hearing nor can the evidence be characterized as repetitive or embellished witness testimony."). The evidence of Anna's needs now are relevant to determining the appropriateness of Anna's placement in 2002–03. A child's educational needs at the time of trial may be relevant in determining the child's needs at the time of disputed events. *See Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 588 (9th Cir.1992) (recognizing "the need for such extrapolation given the likely delay in bringing IDEA cases before the district courts"); *see id.* (finding that a child's "needs at the time of the district court hearing undoubtedly reflect[ed] something of his needs" in the two years before trial when his IEP was prepared).

In this situation, the New IEP Notes are relevant in determining whether the Initial IEP, placing Anna at Murch, was appropriate. Nothing in the new notes suggests that Anna's needs changed in a year, or that the team thought the Initial

---

**8.** The July 22, 2003 team consisted of Anna's parents, Murch Assistant Principle Scott Cartland, Murch teacher Deborah Ziff–Kock, two

officials from Special Educational Services, a clinical psychologist, and plaintiffs' counsel. *See* New IEP Notes at 1.

IEP was appropriate at the time it was formulated. Furthermore, no evidence suggests that Anna's condition deteriorated suddenly between 3/26/02, the date of the Initial IEP, to 7/23/03, when the new IEP was released. *See generally* New IEP Notes. Rather, the simple, unexplained reversal by the new IEP team is evidence that the Initial IEP was wrong, even when formulated in 2002. For instance, two members of the new IEP team from Murch—Deborah Ziff–Cook, Anna's former teacher, and Scott Cartland, present at Initial IEP meeting and witness for DCPS at the hearing-both ratified the new IEP and apparently agree that Anna should be full-time in a private school. *See id.* at 1.

The New IEP Notes are important not because they contain new information about Anna, but because they contain new information about the judgments of those with greater educational expertise than this court. The current consensus among those who know Anna is that a public school placement is simply inappropriate for her. The court does not "substitute [its] own notions of sound educational policy for those of school authorities." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. Rather, instead of deferring to the HOD, the court defers to a subsequent finding of school authorities-the new IEP team. The court therefore concludes that the Initial IEP, recommending Anna's placement at Murch, was inappropriate.[9] It does not, and need not, reach the issue of whether DCPS failed to implement the Initial IEP, since in any case, the IEP was inappropriate.[10]

## C. Private School Placement

Once a plaintiff establishes that the proposed public school placement was inap-

---

**9.** This does not end the public school inquiry. A district court must not inquire merely whether a proposed public school placement is inappropriate; it must also determine that a public school was not capable of providing and implementing an appropriate IEP. *See Angevine v. Smith*, 959 F.2d 292, 296–97 (D.C.Cir. at 1992). However, the new IEP team explicitly rejected any placement involving a general educational setting, New IEP Notes at 2, and found that Anna requires full-time special education. *Id.* Testimony by Dr. Edelstein, seemingly adopted by the new MDT, indicates that "it's not possible for [a placement at Murch] to be individualized to meet Anna's needs .... So it's not a criticism of the teacher. It's not possible to do that in a large class that is a mainstream setting. There isn't the order the children need ...." Tr. at 135 (Test. of Dr. Edelstein).

**10.** Plaintiffs argue that Anna received no benefit from the IEP as written because DCPS failed to implement it properly. However, failure to implement all services outlined in an IEP does not constitute a *per se* violation of the IDEA. *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 348–49 (5th Cir. 2000) (citing *Gillette v. Fairland Bd. of Educ.*, 725 F.Supp. 343 (S.D.Ohio 1989), *rev'd on other grounds*, 932 F.2d 551 (6th Cir.1991)).

No one contests the fact that the specialized aide hired to work with Anna was a "disaster." *See* Tr. at 91. But DCPS's failure to provide special education or related services after the IEP would entitle Anna to compensatory education, not money damages. *See Walker v. Dist. of Columbia*, 157 F.Supp.2d 11, 30 (D.D.C.2001). Failure to implement the IEP might entitle parents of a disabled child compensatory damages 42 U.S.C. § 1983. *See Walker*, 157 F.Supp.2d at 30. However, plaintiffs do not seek compensatory damages, *see* Compl. at 12 (request for relief), despite briefly citing to § 1983 in the jurisdictional portion of their complaint. *Id.* ¶ 2. In any case, recovery under § 1983 requires proof that a municipality's policy or custom led it to violate the federal rights. *See Monell v. N.Y. City Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under 1983."). This plaintiffs fail to do.

propriate, the second inquiry is whether or not the private school placement is appropriate. No one seriously disputes the appropriateness of Kingsbury as a private school placement. The new IEP team recommends Kingsbury unreservedly. *See* New IEP Notes at 1 ("Kingsbury should be strongly considered because it offers continuity."). Unrebutted testimony at the due process hearing in 2002 also indicates that the parties considered Kingsbury appropriate. Tr. at 161 (Test. of Piper Caswell, Kingsbury curriculum development specialist) (noting that Kingsbury's official position is that Kingsbury offers Anna an appropriate placement).

DCPS does not contest the appropriateness of Anna's placement at Kingsbury. *See generally* Defs.' Opp'n. Rather, DCPS's position is that plaintiffs are not entitled to reimbursement because the Murch placement was also appropriate, *see id.* at 10–13, but the court has already overturned this finding. As a result, under *Rowley*, the court finds that (1) Anna's public school placement at Murch was inappropriate and violated FAPE; and (2) Anna's private placement at Kingsbury is appropriate.

## D. Reduction/Denial of Tuition

Even when a court finds parents of a disabled child eligible for tuition reimbursement under *Carter*, 510 U.S. at 15, 114 S.Ct. 361, the 1997 IDEA Amendments allow a court to reduce or deny reimbursement under certain circumstances. *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *Ms. M. v. Portland Sch. Comm.*, 360 F.3d 267, 271 (1st Cir. 2004) ("In 1997, Congress significantly amended IDEA and, in the process, clarified the circumstances in which parents who unilaterally remove their children from private school may receive tuition

reimbursement.") (citing Pub.L. No. 105–17, 111 Stat. 37 (1997)); *id.* at 273 ("The 1997 Amendments tightened up the circumstances under which reimbursement was to be allowed.");. The purpose of these "exceptions to reimbursement" provisions is to "giv[e] the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." *See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir.2004). The 1997 IDEA amendments gave effect and more structure to case law preceding the amendments that held "that reimbursement for private school tuition depended on the parents cooperating with school authorities in determining the proper placement and educational plan for the child." *Id.* at 159; *Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 468 (7th Cir.2000) (indicating that pre-amendment cases made tuition reimbursement for unilateral private school placements "subject to the parties cooperating in the placement process") (citing *Johnson v. Duneland Sch. Corp.*, 92 F.3d 554, 558 (7th Cir.1996)); *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 388 (6th Cir.1998); *Schoenfeld v. Parkway Sch. Dist.*, 138 F.3d 379, 380–82 (8th Cir.1998); *Ash*, 980 F.2d at 589.

A court may reduce or deny tuition reimbursement if, *inter alia*, a disabled child's parents, prior to or during the most recent IEP meeting before removing their child from school, failed to "inform the IEP team that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child including stating their concerns and their intent to enroll their child in a private school at public expense . . . ." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa).[11] A court may

---

11. A court may also deny or reduce reimbursement when parents fail to alert the

also reduce or deny tuition reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the parents." § 1412(a)(10)(C)(iii)(III). The court finds that plaintiffs both failed to provide adequate notice and acted unreasonably,[12] and therefore denies the equitable remedy of tuition reimbursement.

■ Anna's parents failed to provide notice in compliance with either part of § 1412(a)(10)(C)(iii)(I)(aa). The last IEP meeting before Anna went to private school took place on March 26, 2002. Only two weeks after the IEP meeting, on April 12, 2002, that Anna's parents notified the IEP team that Anna would attend Kingsbury during 2002–03. Anna's parents did register certain objections when they submitted a letter along with the signed Initial IEP on April 4, 2002. *See* Schoenbach & Kade Ltr. to Cartland (Bates No. 132). However, this letter was sent only after the March 26, 2002 IEP meeting, and still provided no hint that Anna was to attend Kingsbury. *See id.* Further, while Anna's parents expressed concerns about the Initial IEP, "there is a difference between voicing general dissatisfaction and formally rejecting an IEP." *Loren F.*, 349

F.3d at 1317 (indicating that notice provision of § 1412(a)(10)(C)(iii)(I)(aa)-(bb) requires formal rejection by parents, not just expressions of dissatisfaction).

■ It is clear that Anna's parents failed to provide the statutorily required notice. But the conclusion that Anna's parents acted unreasonably and should be denied reimbursement requires somewhat more explanation. Courts *may* reduce or deny reimbursement-the text of IDEA does not compel them to. 20 U.S.C. § 1412(a)(10)(C)(iii) ("The cost of reimbursement [for unilateral private placements by parents] *may* be reduced or denied") (emphasis added). Just as a court need not allow recovery for a merely technical violation of IDEA without any showing of substantive harm, *see Adam J.*, 328 F.3d at 811–12, the mere fact that parents violated the notice provision may not, in itself, justify reducing or denying tuition reimbursement.

However, most circuits that have decided the issue [13] have upheld complete denials of tuition reimbursement to parents who failed to comply with the notice requirement.[14] In many of these cases,

school district at least ten business days before placing their child in a private school. § 1412(a)(10)(C)(iii)(I)(bb). On April 12, 2002 Anna's parents provided notice of their intent to place Anna at Kingsbury starting in September 2002 and Anna remained at Murch through June 2002. Therefore, plaintiffs have not violated § 1412(a)(10)(C)(iii)(I)(bb).

12. The factors that may lead a court to find that parents have failed to provide statutorily required notice may also lead it to find that the same parents have been unreasonable. *See Loren F. v. Atlanta Indep. Sch. System*, 349 F.3d 1309, 1318, 1319 n. 10 (11th Cir.2003).

13. No D.C. Circuit case yet seems to deal with the notice or unreasonableness provision. One case decided by a D.C. district court mentioned, but did not apply, the IDEA provisions regarding unilateral private school

placements. *See Blackman v. Dist. of Columbia*, 277 F.Supp.2d 71, 83 (D.D.C.2003) (Friedman, J.) (citing unilateral placement provisions of 20 U.S.C. § 1412(a)(10)(C)(i)-(ii), but finding them inapplicable).

14. : *Ms. M.*, 360 F.3d 267, 271 (1st Cir.) (denying reimbursement for parent's failure to comply with statutory notice requirement in § 1412(a)(10)(C)(iii)); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523–24 (6th Cir. 2003) (upholding denial of reimbursement where parents failed to comply with § 1412(a)(10)(C)(iii) and "during the due process hearing ... they did not inform the IEP team ... either that they rejected the placement, or that they intended to enroll [their child] in a private school."); *see also Greenland Sch. Dist.*, 358 F.3d at 159 (1st Cir.) (barring reimbursement where parents failed to notify school district about their dissatisfac-

courts justified totally denying reimbursement because they found that a parent's unreasonableness or failure to provide notice, in substantial part, caused a child's IEP to be inappropriate in the first place.[15] Courts have found total denial of reimbursement too harsh where a parent's actions did not contribute to the inappropriateness of a child's educational plan.[16]

The court finds that the failure of Anna's parents to provide proper notice contributed to the formulation of an inappropriate IEP. Their actions were significant factors in the IEP team's finding that a placement at a public school was appropriate when it was not.

The Edelstein Report-especially the way Anna's parents reacted to it and presented it to others-is central to this analysis.

Anna's parents profess to have been greatly moved by the report since reading it in December 2001. The report first alerted Anna's parents that Anna had Asperger's and also recommended Anna for full-time special educational services. *See* Edelstein Report at 9 (Bates No. 97). Anna's parents claim that the report "has been an eye-opener," that they "refer to the report continuously, in terms of how we need to modify the environment, what sort of attention to be placed on Anna, where her strengths and weaknesses are," and that it has "has been [their] bible" with regard to Anna's condition. Tr. at 109 (Test. of Schoenbach).

The report suggests, but does not directly say, that Anna should be in a private school. Specifically, it indicates that

tion with IEP before unilaterally placing child in private school); *Loren F.,* 349 F.3d at 1319 n. 10 (11th Cir.) (indicating willingness to uphold reimbursement denial, pending remand for fact-finding on whether parents provided notice or acted unreasonably); *MM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 534–35 (4th Cir.2002) (finding school district not liable for failing to timely complete IEP where "parents had been afforded a full and fair involvement in the process" but stopped attending IEP meetings and responding to district's letters); *M.C.,* 226 F.3d at 68 (2d Cir.) (refusing, in a pre–1997 amendments case, reimbursement for private psychological counseling services "where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP"). *But see Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80, 86 (3d Cir.1999) (reversing lower court's total denial of reimbursement because IDEA's broad remedial purpose did not "sanction[ ] a denial of an arbitrary fraction of reimbursement for a portion of the school year where the IEPs are found deficient but the parents' conduct was unreasonable.").

15. *See Loren F.,* 349 F.3d at 1319 n. 10 (noting that where "parents significantly hindered or frustrated the development of an IEP, the district court may be justified in denying equi-

table relief on that ground alone"); *Berger,* 348 F.3d at 524 (finding that parents' failure to provide timely notice of their dissatisfaction with IEP, coupled with their "rejection of the offer to have another [IEP] meeting or engage in mediation" after school district had notice, justified denial of reimbursement); *M.C.,* 226 F.3d at 69 (indicating that because parents "failed to place in issue the appropriateness of [a child's] IEPs," the court could not tell whether a prompt complaint could have "obviated the need for [parents'] expenses," and therefore denied reimbursement).

16. In *Warren G.,* the Third Circuit refused to sanction a total denial of tuition where the school district failed to develop an IEP and where "there is no finding that the parents' conduct obstructed its ability to do so." 190 F.3d at 86. The district court faulted the parents "for making unrealistic and unreasonable demands, providing inaccurate information, contradicting themselves and making false accusations against the District." *Id.* at 85. The Third Circuit reversed, finding that parents should not be penalized for overzealousness. *Id.* at 86 (noting that denying reimbursement undermined IDEA's encouragement of parental involvement "by placing parents at risk that their advocacy may be found extreme at the cost of full reimbursement").

"Anna requires placement in a school which has small classrooms where individual, and small group (3–4 students or fewer) instruction is available daily across all subject areas and which has a staff knowledgeable about children with severe social disabilities." *See* Edelstein Report at 9 (Bates No. 97). Murch did not offer small classroom teaching. Nevertheless the report's implication-that Anna should be in private school-was not self-evident. Anna's parents testified that Drs. Edelstein and Andrews had to convince them that public school was inappropriate; once converted, Anna's parents quickly applied to private schools:

> [W]e argued very strongly with Dr. Andrews and Dr. Edelstein about that: why it had to be a small school; couldn't it be supplement to a regular school. And we argued about that. And they were very clear why. And frankly, I have to tell you, we weren't completely convinced that that was the only way, because we really do love Murch so much. But we felt we had-*We know in order to apply, you have to apply a year ahead. So we started to apply.*

Trans at. 99 (Test. of Daryl Kade) (emphasis added).

Anna's parents gave the report to DCPS which, in turn, gave the report to another psychologist, who presented her review of the report on February 15, 2002. The reviewer seemed to agree with the report's diagnosis and recommended that the IEP team "consider all additional up to date data presented by parents, current teachers, and other personnel." Ada E. Vincent, Review of Clinical Psychological Evaluation at 4 (Feb. 15, 2002) (Bates No. 126). Dr. Vincent's review did not recommend a private school placement and did not seem to read the Edelstein Report as requiring such a placement. *See generally id.* Yet the evidence available on the record suggests DCPS agreed with all findings in the report, and nothing suggests DCPS, before the Initial IEP meeting, favored or disfavored a private school placement.

Critical to the finding that Anna's parents' actions contributed to the inappropriateness of the Initial IEP is the dog that did not bark at the March 26, 2002 IEP meeting. Dr. Edelstein and Anna's parents testified that they strongly believed, before the IEP meeting, that public school was inappropriate; yet they failed to object when the IEP team simply recommended precisely that-a public school placement, albeit with certain special services and accommodations.

First, Dr. Edelstein conceded that, while she attended perhaps half of the IEP meeting on March 26, 2002, she never commented on, much less criticized, the goals and objectives proposed by the Initial IEP. Her silence is striking given the apparent depth of her conviction, also expressed to Anna's parents, that a public school setting was radically inappropriate and even likely to cause Anna's conditions to worsen. *See* Tr. at 142 (Test. of Dr. Edelstein). During her oral testimony, Dr. Edelstein's had difficulty justifying her silence:

> Q: . . . [I]f you heard goals and objectives that you now say are inappropriate being drafted at an IEP meeting, you didn't at any point say that, "maybe you need to revisit these"? . . .
>
> A: I do remember one thing I did says, and that was . . . I was in complete agreement with all of [Dr. Andanitis's] conclusions.

Tr. at 146. The Initial IEP explicitly rejected full-time special education and proposed a general classroom placement with just 5% of Anna's time outside that setting. *See* Initial IEP at 1 (Bates No. 133). But at the meeting when these proposals were

made, Dr. Edelstein failed to criticize a plan she later repudiated as having "no sensitivity ... as to what Asperger's children require." *See* Tr. at 126. This inconsistency struck, unfavorably, the hearing officer. *See* HOD at 4 ("Dr. Edelstein went to the IEP meeting which lasted over three hours, but she did not participate in a discussion on the IEP goals and objections and offered no recommendations on the IEP.").

More importantly, Anna's parents failed to object to Anna's proposed placement at a public school. Anna's parents testified that before the IEP meeting, Drs. Andrews and Edelstein convinced them that only a private school placement was appropriate for Anna. Tr. at 99 (Test. of Kade). Yet they, like Dr. Edelstein, did not protest when the Initial IEP proposed public school. Anna's parents did not suggest that they objected to that placement during the Initial IEP meeting. *See* Tr. at 73–101 (Test. of Schoenbach); Tr. at 102–111 (Test. of Kade). Other IEP team members seemed unaware, at the meeting, that Anna's parents thought public school to be inappropriate, for they had had every opportunity to present objections and did not suggest private school. *Compare* Tr. at 39–40 (Test. of Cartland) (indicating that Cartland worked with the Schoenbachs on the March 26, 2002 IEP, that Cartland "worked particularly with Mr. Schoenbach to ... draft" and accommodated all the wishes expressed by the Schoenbachs at that meeting) *with* Initial IEP Notes (recording no objections by Anna's parents to the IEP).

Eight days after signing the IEP, Anna's parents notified DCPS that they would place Anna at Kingsbury. *See* Gruber Ltr. To Gay (Apr. 4, 2002) (Bates No. 87). They testified that they waited until the end of the 2001–02 school year before deciding to enroll Anna at Kingsbury:

[B]y the end of the year, after the experience with the aide and the tutoring and the inability to get integrated services, we absolutely concluded that the recommendation was right; that Anna needed to be in a smaller classroom setting; that she would not get the attention that she needed, she would not have confidence building. So we decided then, and we informed the school then of our decision at the end of the year.

Tr. at 100–01 (Test. of Kade). This testimony is, simply, wrong. The April 12 letter presented DCPS no requests for more services or even an ultimatum, but a *fait accompli* in unconditional language: "In compliance with the notice requirements of IDEA, DCPS is hereby advised that my clients *will* execute a tuition contract with Kingsbury Day School on or about April 30, 2002, with enrollment scheduled for September, 2002." Gruber Ltr. to Gay (Bates No. 87) (emphasis added). The April 12 letter contradicts testimony that Anna's parents intended to wait and see if the IEP would help Anna before committing to Kingsbury.

In sum, the record and oral testimony indicates that (1) DCPS and the Initial IEP team took the Edelstein Report seriously; (2) that the team took the concerns of Anna's parents seriously and accepted their requests; (3) that the Edelstein Report did not make clear, on its own, that Anna needed to be in private school; (4) that at the March 26, 2002 IEP meeting, or anytime before April 12, 2002, Anna's parents, and Dr. Edelstein, did not mention their conviction that Anna required a private placement. The Initial IEP team may have made a fundamental mistake in believing that the Edelstein Report could be read to allow for a public school placement, or that Anna's condition could improve in a regular classroom with the

piecemeal addition of services (1½ hours of out-of-class instruction, the full time aide). If alerted, the Initial IEP team might have agreed with the Anna's parents and changed the IEP, if the new IEP (recommending Anna's placement at Kingsbury) is any indication.[17] Though strongly convinced before the IEP meeting that such piecemeal services in a general classroom setting were simply *not* sufficient to help Anna progress, neither Anna's parents nor Dr. Edelstein objected to the public school placement at the IEP meeting. Such silence, despite their genuine conviction that Anna needed to be in private school, is inexplicable and unreasonable.

The court concludes that the Initial IEP proposed an inappropriate public school placement in significant part because of the failure of Anna's parents to object to the IEP when given the opportunity to do so. Therefore, plaintiffs are not entitled to tuition reimbursement.

## CONCLUSION

IDEA expects strong parental input at IEP meetings. *Warren G.*, 190 F.3d at 86 ("Vigorous advocacy is an anticipated by-product of a policy encouraging parental involvement."). Such input is critical in assuring that disabled children get the services they need. *Rowley*, 458 U.S. at 209, 102 S.Ct. 3034 ("[I]ndividualized planning conferences are a way to provide parent involvement and protection to assure that appropriate services are provided to a handicapped child."). But parents must talk, or complain, when given the chance. Timely input can allow a school district to respond meaningfully to parental requests. A disabled child's parents are not entitled

to reimbursement for an inappropriate IEP when their input may have made the plan appropriate. An appropriate order accompanies this memorandum opinion.

## ORDER AND JUDGMENT

For the reasons stated in the court's memorandum opinion docketed this same day, it is this 25th day of March, 2004, hereby

**ORDERED** that **JUDGMENT** is entered in favor of defendants and against plaintiffs.

---

17. Parental silence need not be the but-for cause of an IEP's inappropriateness. It suffices that parental input could have made a difference. *See M.C.*, 226 F.3d at 69 (refusing to reimburse where parents "failed to place in issue the appropriateness of [a child's] IEPs," and it was unclear whether a prompt complaint could have "obviated the need for [parents'] expenses").